Opinion for the Court filed by Circuit Judge RANDOLPH.
Opinion concurring in part and concurring in the judgment filed by Circuit Judge ROBERTS.
RANDOLPH, Circuit Judge:
Ephedrine is an active ingredient in over-the-counter medications for the treatment of asthma and nasal congestion. Ephedrine is also used in the illicit production of methamphetamine, a controlled substance. The government regulates ephedrine pursuant to the Controlled Substances Act, as amended by, inter alia, the Chemical Diversion and Trafficking Act of 1988, 21 U.S.C. § 801 et seq. The Act lists 20 chemicals, including ephedrine, used in the illicit production of controlled substances. 21 U.S.C. § 802(34). Companies and individuals wishing to import (or to export, manufacture or distribute) any of these “List I chemicals” must register with the Drug Enforcement Administration. 21 U.S.C. §§ 957(a), 822(a)(1)-®). The “regulated person” must notify DEA no later than 15 days before bringing a listed chemical into the country. 21 U.S.C. § 971(a). DEA has the authority to forbid importation if “the chemical may be diverted to the clandestine manufacture of a controlled substance.” 21 U.S.C. § 971(c)(1). This petition for judicial review challenges DEA’s interpretation of “the chemical may be diverted” as it relates to the importation of ephedrine.
I.
PDK Laboratories, at its New York facilities, manufactures over-the-counter pharmaceuticals and vitamins, including pain relievers, decongestants, diet aids and nutritional supplements. Some of its products contain ephedrine in combination with other active ingredients. PDK purchases raw, bulk ephedrine from foreign companies, combines the chemical with other active agents, and produces a finished product in tablet form, packaged in bottles or blister packs, all with DEA’s permission. PDK currently sells only to wholesale distributors, not to retailers or consumers, although in the past it had a retail mail order business.
Producers of illicit methamphetamine prefer using pure ephedrine. After the 1988 amendments to the Controlled Substances Act imposed record keeping and other controls on transactions involving pure ephedrine, criminals began substituting “single entity” ephedrine tablets - that is, tablets containing ephedrine as the only active medicinal ingredient - for pure ephedrine. When Congress amended the Act again in 1993 to remove the record keeping exemption for single entity ephedrine tablets, illicit methamphetamine producers switched to pseudoephedrine and combination ephedrine products, such as those PDK and its competitors produce. In order to obtain large quantities of this product, criminals shoplift the tablets from retail stores or, individually and in groups, make multiple purchases of the tablets from different stores - a process known in the drug trade as “smurfing.”
PDK has cooperated with DEA in trying to prevent its products from winding up in the hands of methamphetamine producers. It has cut off sales to distributors suspected of selling its drug products in bulk; ended its mail order business; stopped shipping its products to California and *790 Missouri in response to the number of methamphetamine laboratories found in those states; monitored sales to determine if a particular customer has been ordering an extraordinary quantity of its drugs; imposed monthly quotas on its customers; retained a former DEA official to review its compliance program; and altered its packaging to make its over-the-counter drugs less susceptible to illicit uses.
Two of PDK’s foreign suppliers of bulk ephedrine are Indace, Inc. and Malladi, Inc., both of which are registered with DEA as importers of chemicals listed in the Act. Indace, in late 2000, and Malladi, in early 2001, notified DEA that they were about to ship ephedrine hydrochloride from India to PDK in New York. Each shipment was to consist of 3000 kilograms of the chemical in powdered form. In both instances DEA issued to the importer an “Order to Suspend Shipment,” stating that it acted pursuant to § 971(c)(1) on the basis of information indicating that “the listed chemical may be diverted.” By this DEA did not mean that the shipments would be hijacked or otherwise diverted from their intended destination. DEA meant instead that after PDK’s finished products reached the shelves of retail stores, someone might buy (or steal) the ephedrine-containing pills and use them to make methamphetamine. In support of its judgment that “the chemical may be diverted,” DEA described in the suspension orders four instances in 1994 and 1995 when PDK, by mail order, shipped large quantities of tablets containing ephedrine to individuals, some of whom were later arrested for manufacturing methamphetamine. The suspension orders also stated that PDK had exported its finished products to Canada without notifying DEA 15 days in advance, as the statute and regulations required; and that PDK products containing ephedrine and pseudoephedrine had been found at methamphetamine laboratories and “dumpsites,” as reported in “warning letters” DEA sent to PDK. (DEA sometimes notifies manufacturers when their drug products are found at methamphetamine laboratories; these “warning letters” do not assign culpability to the manufacturer.)
PDK litigated the validity of the suspension orders before an Administrative Law Judge. After an evidentiary hearing, the ALJ ruled in PDK’s favor, finding that there was no evidence that the shipments of ephedrine from Indace and Malladi might have been diverted to illegal uses. As to PDK’s finished products - the pills sold over the counter in retail stores - the ALJ held that these were not “listed chemicals]” within § 971’s meaning even though they contained ephedrine. In the alternative, the ALJ held that DEA had not satisfied the “may be diverted” portion of § 971. The ALJ’s reasoning was as follows. PDK is the largest manufacturer of generic List I chemical products sold in convenience stores. In 1998, for instance, PDK distributed approximately 10 million bottles of its combination ephedrine product; in the same year DEA warning letters indicated that 1,061 such bottles - about .01 percent of the total PDK distributed - had been seized at illicit sites. There was no evidence to show whether other manufacturers of ephedrine products had a lower or higher percentage. There was evidence that all ephedrine-containing medications, from whichever manufacturer, “may be diverted” in this manner. Even if retail stores limited a customer’s purchases of these drugs, individuals could simply buy the drugs from many different stores or steal them.
On DEA’s exceptions to the ALJ’s decision, the DEA Deputy Administrator sustained the suspension orders, ruling that § 971(c)(l)’s reference to “the chemical” encompassed not only the chemical to be *791 imported - here ephedrine - but also products manufactured from the chemical. 67 Fed. Reg. 77,805, 77,806 (Dec. 19, 2002). In support of this interpretation, the Deputy Administrator invoked the definition of “regulated transaction” in 21 U.S.C. § 802(39)(A)(iv); the opinion in United States v. Abdul Daas, 198 F.3d 1167, 1175 (9th Cir.1999); and a 1993 House Committee Report. 67 Fed. Reg. at 77,806. In finding that PDK’s finished products “may be diverted,” the Deputy Administrator recited warning letters given to PDK involving not only its combination ephedrine products but also its pseudoephedrine drugs, and other information contained in the suspension orders, but - agreeing with the ALJ - decided that PDK had not violated reporting requirements with respect to its mail order sales. Id. at 77,808-09.
The Deputy Administrator also relied on PDK’s alleged export violations. Id. at 77,809. In 1994 and 1995 PDK sold ephedrine tablets to Sun Labs of Canada without notifying DEA in advance. The Deputy Administrator concluded that PDK thereby violated a regulation (21 C.F.R. § 1313.21) requiring exporters to give DEA notice 15 days in advance of each transaction in which a listed chemical is exported from the United States. Although the ALJ found that PDK had not exported the tablets, that it had sold the tablets and transferred ownership to Sun Labs in New York, and that there was no evidence the tablets were ever delivered to Canada, the Deputy Director ruled that PDK had failed to comply with the regulation because its president believed the tablets would eventually be shipped to Canada. 67 Fed. Reg. at 77,808.
The warning letters plus PDK’s export violations led the Deputy Administrator, looking at what he called “the totality of the circumstances,” to conclude that the suspension orders should be sustained despite evidence that PDK had made significant efforts to prevent its finished products from being used illegally. Id. at 77,809.
II.
There is no doubt that PDK suffered an injury when the shipments of ephedrine did not arrive; and that its injury could be redressed if we found the DEA orders invalid. While PDK thus has Article III standing to sue, see Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 38-39, 96 S.Ct. 1917, 1924-25, 48 L.Ed.2d 450 (1976), DEA argues that the company lacks prudential standing.
In deciding whether a litigant has prudential standing, the court must identify what interest the litigant seeks to vindicate and then decide if that interest is “arguably within the zone of interests to be protected or regulated by the statute,” Ass’n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). The test, which may be understood as a gloss on the judicial review provision of the Administrative Procedure Act (5 U.S.C. § 702), see Clarke v. Sec. Indus. Ass’n, 479 U.S. 388, 400 n. 16, 107 S.Ct. 750, 757 n. 16, 93 L.Ed.2d 757 (1987), is not demanding. See Animal Legal Defense Fund, Inc. v. Glickman, 154 F.3d 426, 444 (D.C.Cir.1998) (en banc). The court “should not inquire” whether Congress intended to benefit or regulate the litigant. Nat’l Credit Union Admin. v. First Nat’l Bank, 522 U.S. 479, 488-89, 492, 118 S.Ct. 927, 933-34, 140 L.Ed.2d 1 (1998). It is enough that the litigant’s interest is “arguably” one regulated or protected by “the statutory provision at issue,” id. at 492, 118 S.Ct. at 935.
PDK’s interest was in buying ephedrine and using it to manufacture drugs; the importers’ interest was in selling the *792 chemical to PDK. Although suspension orders are directed to importers, § 971(c)(1) necessarily regulated the interests not only of importers but also of their domestic customers. The point is so obviously clear and so clearly obvious that it is scarcely worth articulating - if an importer cannot ship a listed chemical, the domestic customer cannot receive it. PDK’s interests are thus arguably, indeed more than arguably, within the zone of interests § 971(c)(1) regulates. DEA’s Deputy Director made the point in a related context: “the party in interest in this proceeding is the manufacturer-customer of the importer. It is the conduct of that party, PDK, and its customers, and the fact that the product which it manufactured and distributed ended up in clandestine drug laboratories, that forms the basis of the Government’s contention that the ephedrine imported ‘may be diverted.’ ” 67 Fed. Reg. at 77, 806-07.
DEA argues against PDK’s prudential standing on the basis of the following language from § 971(c)(2): “a regulated person to whom an order applies under paragraph (1) is entitled to an agency hearing on the record in accordance with” the Administrative Procedure Act. According to DEA, § 971(c)(2) entitles only the importer - as “a regulated person to whom [a suspension] order applies” - to an agency hearing on the validity of the order. There is no formal DEA ruling or regulation to this effect and the only judicial precedent on point is Judge Kennedy’s decision, in an earlier phase of this case, ordering DEA to provide PDK with a hearing. PDK Labs Inc. v. Reno, 134 F.Supp.2d 24, 31 (D.D.C.2001). A “regulated person” is a “person who manufactures, distributes, imports, or exports a listed chemical, a tableting machine, or an encapsulating machine.... ” 21 U.S.C. § 802(38). PDK is therefore “a regulated person.” Judge Kennedy held that because the orders blocked shipments to PDK, the company is also someone “to whom an order applies,” a .result he thought consistent with Yi Heng Enterprises Dev. Co., 64 Fed. Reg. 2234, 2235 (DEA Jan. 13, 1999) (“the statute provides the opportunity for a hearing to ‘a regulated person to whom an order (suspending shipment) applies,’ not necessarily the person to whom the order was issued.”). PDK Labs v. Reno, 134 F.Supp.2d at 30.
DEA’s contrary argument - that under § 971(c)(2) only “ ‘a regulated person to whom an order applies under paragraph 1’ is entitled to judicial review,” and that only importers fit that description, Respondent’s Br. at 20 - is wrong for several reasons. Very rarely has Congress withheld judicial review from those who have suffered an Article III injury at the hands of an administrative agency. See Bowen v. Michigan Acad. of Family Physicians, 476 U.S. 667, 670-71, 106 S.Ct. 2133, 2135-36, 90 L.Ed.2d 623 (1986). Time and again the Supreme Court has emphasized that there is a “strong presumption” in favor of judicial review, id. at 670, 672 n. 3, 106 S.Ct. at 2135 n. 3, and that “only upon a showing of ‘clear and convincing evidence’ of a contrary legislative intent should the courts restrict access to judicial review.” Abbott Labs. v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967); see, e.g., Gutierrez de Martinez v. Lamagno, 515 U.S. 417, 424-25, 115 S.Ct. 2227, 2231-32, 132 L.Ed.2d 375 (1995); Block v. Community Nutrition Inst., 467 U.S. 340, 349, 104 S.Ct. 2450, 2455-56, 81 L.Ed.2d 270 (1984). We do not believe there is any such legislative intent here. Section 971(c)(2) is not itself a judicial review provision. It is instead a provision dealing with hearings before the agency. See Envirocare of Utah, Inc. v. Nuclear Regulatory Comm’n, 194 F.3d 72, 75-76 (D.C.Cir.1999). One can envision a statutory sys *793 tem in which only those who may participate in agency proceedings are entitled to review in court. Id. The Supreme Court in Block so interpreted the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. § 601 et seq., in holding that consumers could not bring actions for judicial review of the Agriculture Secretary’s milk marketing orders. 467 U.S. at 347, 104 S.Ct. at 2454. But DEA concedes that even on its reading of. § 971(c)(2), PDK could participate in an agency hearing challenging a suspension order, so long as the importer initiated the challenge (which neither Indace nor Malladi did). Respondent’s Br. at 21. Furthermore, in Block the Court discerned several reasons why Congress would not have wanted consumers to bring judicial challenges to the marketing orders. 467 U.S. at 347-52, 104 S.Ct. at 2454-57. Here, it is hard to see any cogent reason why Congress would give importers a right to judicial review, but deny that right to their domestic customers who have as much to lose.
DEA tries to come up with such a reason: to avoid ' wasteful proceedings as when a customer succeeds in getting a suspension order vacated but the importer then decides not to go through with the deal. Respondent’s Br. at 21. DEA apparently believes that the contractual arrangements between the parties would permit the importer to back out. We have no way of knowing if that is a customary way of doing this business; and DEA has provided nothing to indicate that Congress thought it was. There is another problem with DEA’s rationale. Everyone agrees that importers have a right to judicial review. Yet if the parties are free to cancel a deal, as DEA assumes, there is a risk that the customer will call it off .after the importer wins in court and has the suspension order set aside. In other words, DEA’s argument offers no rational distinction between importers, who may seek judicial review, and domestic customers, who DEA says cannot. In addition, the Deputy Director’s ruling in PDK’s case would preclude it from buying ephedrine from any importer. On his view, the suspension order rests on what may happen to the finished products after they leave PDK’s facilities. No matter which importer sought to supply PDK, a suspension order presumably would issue. A ruling , against the validity of the orders in this case, far from being an academic exercise, therefore has practical future consequences for PDK even if Indace or Malladi cancel their deals.
As to the judicial review provision of the Controlled Substances Act, 21 U.S.C. § 877, this gives no indication that Congress meant to grant judicial review to importers but to withhold it from their domestic customers. Section 877 merely provides, in familiar language, that “any person aggrieved” by a final DEA decision is entitled to judicial review in the court of appeals. While statutory language and legislative history may overcome the presumption in favor of judicial- review, see Block, 467 U.S. at 349, 104 S.Ct. at 2455-56, there is no language in § 877 and no legislative history DEA has cited that accomplishes that here. In view of the interpretation of statutes applicable to other agencies containing language identical to § 877, we hold that if PDK has Article III standing, which no one doubts, and if its interests are “arguably within the zone of interests” § 971(c)(1) regulates, which we believe they are, PDK is a “person aggrieved” within § 877’s meaning and is entitled to prosecute its case in court. See, e.g., Director, Office of Workers’ Comp. Programs v. Newport News Shipbuilding & Dry Dock Co., 514 U.S. 122, 126-27, 115 S.Ct. 1278, 1283-84, 131 L.Ed.2d 160 (1995); New World Radio, Inc. v. FCC, 294 F.3d 164, 169 (D.C.Cir. *794 2002); Louisiana Energy & Power Auth. v. FERC, 141 F.3d 364, 366 (D.C.Cir.1998).
In holding that PDK has prudential standing, we have avoided placing a judicial interpretation on § 971(c)(2), the hearing provision. As we have said, DEA has not yet rendered any formal interpretation of this provision. Compare Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), with Envirocare of Utah, Inc. v. Nuclear Regulatory Comm’n, 194 F.3d at 75-76. There will be time enough to consider whatever construction DEA ultimately places on the provision. In the meantime, companies in PDK’s position have prudential and Article III standing to challenge suspension orders, which themselves must contain “a statement of the legal and factual basis” for the order, 21 U.S.C. § 971(c)(1). See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).
III.
To repeat, § 971(c)(1) authorizes DEA to “order the suspension of any importation ... of a listed chemical ... on the ground that the chemical may be diverted to the clandestine manufacture of a controlled substance.” The main interpretive question in the case is whether, as the suspension orders assume, “the chemical may be diverted” includes the prospect that PDK’s ephedrine-containing pills in retail stores will be sold to, or shoplifted by, people who will then use the pills to produce methamphetamine.[1] The Deputy Administrator concluded that the statute plainly meant what the suspension orders assumed. He reached this conclusion without mentioning any policy considerations or other matters within the agency’s expertise. Apparently for this reason, DEA neither invokes Chevron v. NRDC, 467 U.S. 837, 843-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984), nor asks us to give any special deference to the Deputy Administrator’s judgment about the meaning of the provision. See, e.g., Prill v. NLRB, 755 F.2d 941, 956-57 (D.C.Cir.1985); Alarm Indus. Communications Comm. v. FCC, 131 F.3d 1066, 1072 (D.C.Cir.1997); Transitional Hosps. Corp. v. Shalala, 222 F.3d 1019, 1028-29 (D.C.Cir.2000); ITT Indus., Inc. v. NLRB, 251 F.3d 995, 1004 (D.C.Cir.2001); Arizona v. Thompson, 281 F.3d 248, 254 (D.C.Cir.2002).
As one of his reasons for thinking the statute clear, the Deputy Administrator cited “the legislative history of the Chemical Diversion Control Act of 1993, Public Law 103-200, § 9, 107 Stat. 2333 (1993),” and stated that this legislation was meant “to close the ‘loophole’ for those who divert ephedrine drug products.” 67 Fed. Reg. at 77,806. Congress enacted § 971(c)(1) in 1988, but the House Report the Deputy Administrator cited came out five years later, in 1993. In all cases, “the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one,” United States v. Price, 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960), and have “very little, if any, significance.” Rainwater v. United States, *795 356 U.S. 590, 593, 78 S.Ct. 946, 949, 2 L.Ed.2d 996 (1958). In this case, the “basis” is “hazardous” indeed.[2] The “loophole” mentioned in the House Report did not deal with the importation of listed chemicals; it dealt instead with domestic reporting and record keeping relating to finished products. The Report explained the purpose of the legislation: “to provide authority to [DEA] to require that manufacturers of ephedrine products sold over-the-counter maintain transaction records.” H.R.Rep. No. 103-379, pt. 1, at 5 (1993). If this later statute and its history had any bearing on the meaning of § 971(c)(1), it would tend to support PDK, not DEA. The Chemical Diversion Control Act of 1993 drew a distinction between, on the one hand, the finished product and, on the other hand, the listed chemical. Thus, § 814(a) provides that DEA may remove a“drug or a group of drugs” containing “a listed chemical” from the exemption for reporting. 21 U.S.C. § 814(a). And § 814(e), which specifically relates to ephedrine, gave DEA authority to reinstate the exemption if it found that “the drug product” was “manufactured and distributed in a manner that prevents diversion.” Id. § 814(e). One might say, therefore, that in the view of a later Congress it is PDK’s “drug” or “drug product,” not the “listed chemical” mentioned in § 971(c)(1), that is being diverted. The same may be said of § 802(39)(A)(iv)(I)(aa), on which the Deputy Administrator also relied. 67 Fed. Reg. at 77,806. This provision also resulted from the 1993 legislation and it too speaks in terms of “the drug” containing ephedrine rather than, as in § 971(c)(1), simply “a listed chemical” or “the chemical.”
Current DEA regulations are to the same effect. The regulations, in defining a “regulated transaction,” distinguish between a “drug containing] ephedrine” and “a listed chemical.” 21 C.F.R. § 1300.02(b)(28)(i)(D)(l). “The term combination ephedrine product means a drug product containing ephedrine.... ” 21 C.F.R. § 1300.02(b)(32). And when referring to the type of diversion the Deputy Administrator had in mind in this case, the regulations speak not of the diversion of the listed chemical, but of the diversion of “the drug or group of drugs ... to obtain the listed chemical for use in the illicit production of a controlled substance,” 21 C.F.R. § 1300.02(b)(28)(i)(D)(l)(ii). The 1993 amendment uses the identical language. 21 U.S.C. § 802(39)(A)(iv)(I)(bb).
The Deputy Administrator also thought that § 971(c)(l)’s meaning was plain in light of the decision of the Ninth Circuit in United States v. Daas, 198 F.3d 1167, 1175 (1999), which he described as holding that the “plain meaning” of “listed chemical” encompasses ephedrine contained in fin *796 ished products. 67 Fed. Reg. at 77,806. Daas was a criminal case. The defendant sold decongestants containing ephedrine to convenience stores knowing the drugs would be used to manufacture methamphetamine. The court sustained his conviction for violating what is now 21 U.S.C. § 841(c)(2). Section 841(c)(2) states that anyone who “possesses or distributes a listed chemical knowing, or having reasonable cause to believe, that the listed chemical will be used to manufacture a controlled substance” is guilty of an offense. In an analysis the Deputy Administrator adopted, 67 Fed. Reg. at 77,806, the court held that because ephedrine did not change its chemical composition when mixed with other ingredients to form decongestants, it was plain that the defendant was distributing “a listed chemical” when he sold decongestants to retail stores. 198 F.3d at 1174-75.
There is logic in the Ninth Circuit’s reasoning, and in the Deputy Administrator’s reliance on the decision. When Congress uses the same word in different parts of a statute, it usually means the same thing. See Sullivan v. Stroop, 496 U.S. 478, 484, 110 S.Ct. 2499, 2503-04, 110 L.Ed.2d 438 (1990); Energy Research Found. v. Defense Nuclear Facilities Safety Bd., 917 F.2d 581, 583 (D.C.Cir.1990). But statutory interpretation is not just about logic. See Henry J. Friendly, Mr. Justice Frankfurter and the Reading of Statutes, in BenchmaRks 213 (1967). The words of the statute should be read in context, the statute’s place in “the overall statutory scheme” should be considered, and the problem Congress sought to solve should be taken into account. Davis v. Michigan Dep’t of Treasury, 489 U.S. 803, 809, 109 S.Ct. 1500, 1504, 103 L.Ed.2d 891 (1989). As to the last, we know that when § 971(c)(1) was enacted in 1988, the problem Congress addressed - at least with respect to ephedrine - was not the misuse of finished products at the retail level. (Section 841(d)(2), the statute at issue in Daas, was also part of the 1988 amendments.) The problem instead was, as the Deputy Administrator stated in his opinion here, the diversion of imported bulk ephedrine to illegal uses. 67 Fed. Reg. at 77,807. It was only years later, after amendments to provisions other than § 971(c)(1), that the use of ephedrine-containing pills to make methamphetamine became widespread. This is at least some indication that Congress, in § 971(c)(1), did “not directly address[] the precise question at issue” in this case. Chevron, 467 U.S. at 843, 104 S.Ct. at 2782.
In saying this we recognize that the “fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning.” Union Bank v. Wolas, 502 U.S. 151, 158, 112 S.Ct. 527, 531, 116 L.Ed.2d 514 (1991). But we do not agree that the language of § 971(c)(1) plainly covers the diversion of finished products, or drug products. That a statute is susceptible of one construction does not render its meaning plain if it is also susceptible of another, plausible construction, as we believe this statute is. Section 971(c)(1) deals with importation (and exportation) of listed chemicals. It does not regulate what a drug manufacturer does with the chemical after receiving it; other sections of the Act control that subject. When § 971(c)(1) states that DEA may stop the importation if “the chemical may be diverted to the clandestine manufacture of a controlled substance,” one might ask: “Diverted from what?” In context, a reading as plausible as the Deputy Administrator’s is that Congress meant only to cover diversions during importation. On this view, § 971(c)(1) would authorize suspen *797 sion orders only if the imported chemical might not reach its intended destination - the legitimate, domestic manufacturer.[3]
One other consideration deserves mention. The evidence in this case showed that all ephedrine-containing pills, no matter who manufactures them, may be used to make methamphetamine, and that every company producing drugs containing List I chemicals has had its products diverted from the legitimate treatment of illnesses to illegal uses. It follows that under the Deputy Administrator’s reading of § 971(c)(1), DEA would have blanket authority to prevent the importation of ephedrine to any domestic manufacturer. Indications are that PDK could obtain bulk ephedrine only from overseas suppliers. Yet no one doubts that Congress did not intend to ban, or to give DEA the authority to ban, all sales of ephedrine-containing drugs in retail stores. DEA itself has acknowledged “Congress’ intent that public access to the [ephedrine-containing] products at the retail level be protected....” 62 Fed. Reg. 52,253, 52,254 (DEA Oct. 7, 1997).
The Deputy Administrator attempted to avoid this problem by relying on Mediplas Innovations, 67 Fed. Reg. 41,256 (DEA June 17, 2002), and its “totality of circumstances” analysis to define “may be diverted.” 67 Fed. Reg. at 77,807. This kitchen-sink approach allows “consideration of the widest possible range of relevant evidence,” without quantifying the relative weight to be given to any particular consideration. Mediplas Innovations, 67 Fed. Reg. at 41,261. DEA may thus consider the quantity of a manufacturer’s drugs identified in DEA warning letters without determining whether competing manufacturers, whose importations were not suspended, had a comparable percentage of their products diverted. DEA may also take into account the extent to which the manufacturer has complied with DEA regulations requiring timely filing of certain forms, id. at 41,262, its efforts to cooperate with DEA, id. at 41,264, and other matters. The wide range of factors DEA used in Mediplas, and in this case, to give meaning to “the chemical may be diverted” language of § 971(c)(1) seems hardly the stuff of plain meaning.
In short, we do not agree that the meaning of § 971(c)(1) is as plain as DEA says it is. It may be that here, as in other cases, the strict dichotomy between clarity and ambiguity is artificial, that what we have is a continuum, a probability of meaning. In precisely those kinds of cases, it is incumbent upon the agency not to rest simply on its parsing of the statutory language.[4] It must bring its experience and expertise to bear in light of competing *798 interests at stake. See Chevron v. NRDC, 467 U.S. at 865-66, 104 S.Ct. at 2792-93. When it does so it is entitled to deference, so long as its reading of the statute is reasonable. But it has not done so here and at this stage it is not for the court “to choose between competing meanings.” Alarm Indus. Communications Comm. v. FCC, 131 F.3d at 1072; see, e.g., Prill v. NLRB, 755 F.2d at 956-57; Transitional Hosps. Corp. v. Shalala, 222 F.3d at 1028-29; ITT Indus., Inc. v. NLRB, 251 F.3d at 1004; Arizona v. Thompson, 281 F.3d at 254.
In trying to distinguish the Prill line of decisions, the concurring opinion states that unlike those cases, here “[w]e know how the agency would choose to interpret the statute” on remand. Concurring op. at 808. We know no such thing. Yes, DEA did exercise discretion when it issued the order here, but before doing so it necessarily had to decide what § 971(c)(1) meant. That is the issue the agency must reconsider on remand. In addition, it is important to remember that if we find that an agency’s stated rationale for its decision is erroneous, we cannot sustain its action on some other basis the agency did not mention. See SEC v. Chenery Corp., 332 U.S. 194, 200, 67 S.Ct. 1575, 1579 (1947). The law of this circuit requires in those circumstances that we withhold Chevron deference and remand to the agency so that it can fill in the gap. As we held in Arizona v. Thompson, 281 F.3d at 254, deference to an agency’s interpretation of a statute is not appropriate when the agency wrongly “believes that interpretation is compelled by Congress.” See, e.g., ITT Indus., Inc. v. NLRB, 251 F.3d at 1004; Transitional Hosps. Corp. v. Shalala, 222 F.3d at 1028-29; Alarm Indus. Communications Comm. v. FCC, 131 F.3d at 1072.
Even if § 971(c)(1) plainly meant what DEA thought, we would still have to vacate the Deputy Administrator’s decision and remand the case.[5] In applying his “totality of circumstances” approach to determining whether the listed chemical may be diverted, the Deputy Administrator ruled that PDK had violated an export notification regulation when it made four deliveries of tablets containing ephedrine between 1994 and 1995 to Sun Labs of Canada in New York. 67 Fed. Reg. at 77,807-08. The Deputy Administrator did not explain how alleged export violations were relevant to determining whether PDK’s finished products might be used in methamphetamine laboratories. In any event, the Deputy Administrator failed to distinguish, indeed did not mention, Alfred Khalily, Inc., 64 Fed. Reg. 31,289 (DEA June 10, 1999), which held that a company selling List I chemicals to a foreign buyer but delivering the chemicals to the buyer in the United States “was not responsible for filing any export documentation.” Id. at 31,293 n. 2. Khalily could not have escaped the Deputy Administrator’s attention; the ALJ had cited it in her opinion. An agency may of course alter its positions over time, but the “agency acts arbitrarily when it departs from its *799 precedent without giving any good reason.” Northern California Power Agency v. FERC, 37 F.3d 1517, 1522 (D.C.Cir.1994). DEA recognizes as much and confesses that the Deputy Administrator erred in failing to reconcile his ruling with Khalily. But, DEA continues, this is of no moment because the result of the agency proceedings would not have changed.
In administrative law, as in federal civil and criminal litigation, there is a harmless error rule: § 706 of the Administrative Procedure Act, 5 U.S.C. § 706, instructs reviewing courts to take “due account ... of the rule of prejudicial error.” If the agency’s mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration. But in this case we cannot say that the Deputy Administrator’s error was of that sort. It is entirely possible that, on remand, he will decide to adhere to Khalily, in which event PDK will be exonerated from any export violations. The Deputy Administrator stated that it was “the totality of circumstances” that led him to sustain the suspension orders, and four of the “circumstances” prominently mentioned were PDK’s export violations. 67 Fed. Reg. at 77,807. What weight he gave to those circumstances (or any others) is impossible to discern. The decision upholding the suspension orders must therefore be set aside and the case remanded.

So ordered.

. The concurring opinion severs ''chemical” from ''diverted,” and then treats each word as if it should be construed in isolation. But the correct approach is to take the language of § 971(c)(1) in its entirety, rather than trying to construe each word separately. See, e.g., Davis v. Michigan Dep’t of Treasury, 489 U.S. 803, 809-10, 109 S.Ct. 1500, 1504-05, 103 L.Ed.2d 891 (1989); United States v. Morton, 467 U.S. 822, 828, 104 S.Ct. 2769, 2773, 81 L.Ed.2d 680 (1984). It is true that one must comprehend the words in a statute in order to comprehend the statute, just as one must comprehend the letters in a word in order to comprehend the word. But it is equally true that one cannot understand a statute merely by understanding the words in it.

. The concurring opinion, like the Deputy Administrator, relies heavily on this legislation and its history, treating it as "significant” because it altered the definition in § 802(39) of "regulated transactions.” Concurring op. at 803 & 805. But the 1993 amendments did not amend the language at issue here. How the 1993 amendments "changed the reach” of § 971(l)(c), as the concurrence supposes (at 806 n.6), thus remains a mystery. Section 971(c)(1) did not give DEA authority to suspend "regulated transactions.” The authority Congress conferred in 1988 was and is limited to suspending importations or exportations of listed chemicals. Such importations and exportations are a subset of “regulated transactions” as § 802(39)(A) defines the term. To say that other regulated transactions are included in § 971(c)(1) is simply to restate the question in the case.
As to the 1996 legislation, which the concurrence also invokes, it too did not alter § 971(c)(1) and neither the DEA Deputy Administrator, in his reasons for interpreting § 971(c)(1) to cover shipments of bulk ephedrine, nor the government in its brief, relied on it.

. The concurring opinion states that § 971(c)(1) “contains no words of limitation.” Concurring op. at 800, 803. That of course assumes the issue. If "the chemical may be diverted” means only diversion of ephedrine away from the manufacturer during importation, the statute does indeed contain words of limitation. The dictionary definition of "divert” cited in the concurrence lends further support to the plausibility of this interpretation. Concurring op. at 801. We do not say that this is the only possible interpretation of § 971(c)(1). Our point instead is that the statute's meaning is not as clear as the DEA Deputy Administrator made it out to be.

. The concurring opinion assumes that the so-called Chevron "step 1” is limited to determining whether the statute has a plain meaning. Concurring op. at 806. But in deciding whether Congress directly addressed a particular issue (step 1), one may use “the traditional tools of statutory construction.” 467 U.S. at 843 n. 9, 104 S.Ct. at 2781; see, e.g., Am. Bankers Ass’n v. Nat’l Credit Union, 271 F.3d 262, 271 (D.C.Cir.2001). This is all the DEA Deputy Administrator did, and it is all that we have done in examining the language and context of § 971(c)(1).

. We do not understand the complaint in the concurring opinion that we should have disposed of this case solely on this basis, without saying anything about the Deputy Administrator’s interpretation of § 971(c)(1). Giving several, separate reasons for reversing and remanding is a time-honored, prudent mode of appellate jurisprudence, see, e.g., Erie R.R. v. Tompkins, 304 U.S. 64, 72-73, 77-79, 58 S.Ct. 817, 819-20, 822-23, 82 L.Ed. 1188 (1938); Kleppe v. Sierra Club, 427 U.S. 390, 403-06, 96 S.Ct. 2718, 2727-28, 49 L.Ed.2d 576 (1976). So here. DEA should have our opinion on the statutory construction issue so that it may deal with that issue now, rather than later if PDK seeks judicial review of DEA's decision on remand.