[Cite as *Heigel v. MetroHealth Sys.*, 2024-Ohio-1471.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

LINDA HEIGEL,                                          :

     Plaintiff-Appellant,                      :

                                           No. 112900

     v.                                                    :

THE METROHEALTH SYSTEM,                 :
ET AL.,

     Defendants-Appellees.                     :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 18, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-21-950160

---

### *Appearances:*

Thorman Petrov Group Co., LPA, and Daniel P. Petrov, *for appellant*.

Zashin & Rich Co., L.P.A., David P. Frantz, and Jzinae N. Jackson, *for appellees*.

MICHAEL JOHN RYAN, J.:

{¶ 1} Plaintiff-appellant, Linda Heigel, appeals the trial court's decision to grant summary judgment in favor of defendants-appellees The MetroHealth System and MetroHealth nurse Kathleen Rizer (collectively referred to as "MetroHealth"). For the reasons that follow, we affirm.

## I. Background

{¶ 2} In March 2021, Heigel was hired by MetroHealth for the position of Director of Nursing of MetroHealth's Ambulatory Network. She was employed less than two months before being terminated from employment. Heigel's position included overseeing seven of MetroHealth's outpatient clinics including J. Glen ("Glenville"), Old Brooklyn, and Broadway. As a director of nursing, she was to ensure "the provision of high quality, culturally sensitive, nursing/patient care in accordance with evidence-based practice, current research, the American Nurses Association (ANA) Scope and Standards of Nursing Practice and the ANA Code of Ethics for the assigned clinical areas." Heigel was also responsible for ensuring compliance with all "regulatory agencies and applicable standards of nursing practices." It is undisputed that Heigel was an at will employee subject to a 90-day probationary period and was terminated during that period.

{¶ 3} The Joint Commission is an independent not-for-profit organization that health care organizations employ to develop standards, perform surveys, and assist with accreditation. Heigel had prior experience with the Joint Commission. This impressed those who interviewed her for her position, including Rizer. Shortly

after MetroHealth hired Heigel, Rizer was promoted to Assistant Chief Nursing Officer and became Heigel's supervisor.

{¶ 4} Heigel began identifying and reporting serious compliance issues to the appropriate people at MetroHealth and met with Rizer at the Glenville clinic to discuss these issues. According to Rizer, they immediately began to address Heigel's concerns. But employees began to complain about Heigel's behavior. During a Glenville site visit, the clinic's nurse manager expressed to Rizer that Heigel had engaged in "abrasive" and "aggressive" behavior with Glenville employees and her comments to the employees were "destructively critical." The nurse manager stated that Heigel's behavior was "bullying-like." She did not, however, dispute Heigel's concerns with compliance issues; the nurse manager's issues were solely with how Heigel had behaved on site.

{¶ 5} In late April, Heigel attended a walkthrough at the Old Brooklyn clinic, which had recently undergone renovation. During the walkthrough, which was supposed to be a celebratory occasion, Heigel noted to those in attendance what she found to be Joint Commission standard compliance issues relating to the sizes of the sink, patient privacy issues, and the location of a sharps container.

{¶ 6} After the walkthrough, the director of the Old Brooklyn clinic contacted Kimberly Svoboda, MetroHealth's Executive Director of Ambulatory Operations, and reported that Heigel made deflating comments during the walkthrough such as, "I don't know why they would do that" and "I wouldn't do it that way," which made for a "difficult environment" among those in attendance. Svoboda contacted Heigel

to discuss the concerning feedback she had received about Heigel. Svoboda told Heigel that MetroHealth valued her perspective, expertise, and feedback, but said that her criticisms "needed to be in the right situation." The walkthrough was not an appropriate time because it was supposed to be an opportunity to build confidence among staff and providers.

{¶ 7} Another director of nursing who attended the event contacted Rizer and reported that Heigel did not show she was supportive to the other employees. According to this director, the other employees were feeling "a little defeated at that moment" because they had worked so hard on the renovation.

{¶ 8} Heigel asked who had complained about her at Old Brooklyn, but Svoboda and Rizer would not disclose names. Heigel then emailed a few of the clinic employees, apologizing if any of her comments were "perceived to be critical." She also emailed Svoboda stating that she realized that staff at the clinic "could have perceived some of my comments * * * in a negative way."

{¶ 9} Another situation arose in the beginning of May, during a staff meeting at the Broadway clinic. During the meeting, Heigel asked a medical assistant about message response times. The clinic's nurse manager interjected on the medical assistant's behalf and responded to Heigel's question. After the meeting, Heigel called the nurse manager into her office and accused her of "undermining what I was trying to do, which was just understand what the process was."

{¶ 10} The nurse manager immediately went to Carrie Prochazka from human resources, who was on site that day. She described Heigel as "abrasive" and "a bully," and threatened to quit if she had to continue to work with Heigel. Prochazka subsequently met with Heigel to discuss the situation. During that meeting, Heigel asked Prochazka if she thought she (Heigel) was abrasive. Prochazka responded that she thought Heigel could be perceived that way. Heigel stated she was surprised Prochazka felt that way.

{¶ 11} On May 7, 2021, Rizer met with her supervisor, Melissa Kline, Chief Nursing Officer and Senior Vice President of Patient Care Services. At the meeting, Rizer and Kline discussed the numerous complaints Rizer had received about Heigel in the short time Heigel had been working at MetroHealth. They discussed that Heigel had "significant issues" with her communication style and described her behavior as "bullying," "destructively critical," focusing "on the negative," "abrasive," "abrupt," and "rude." Following this meeting, the concerns with Heigel were advanced to the MetroHealth's Director of Human Resources who directed Rizer and Kline to provide written summaries of the issues with Heigel, which they did.

{¶ 12} On May 12, 2021, the director presented Heigel with a termination letter. Rizer was also in attendance. The letter provided, in part:

> Ms. Heigel's overall communication with staff does not meet the expectations for a respectful, collaborative work environment. Despite coaching, Ms. Heigel has failed to meet the expectations set forth by MetroHealth's STAR-IQ Values and Code of Conduct within her first

40 days of employment. As a result, Ms. Heigel's employment is terminated effective immediately.

{¶ 13} The parties signed the termination memorandum and Heigel wrote on the memorandum: "I believe this termination is a result of my communication regarding significant regulatory issues and concerns regarding [patient] safety. I was vocal about regulatory compliance, and I feel this is the result."

{¶ 14} Heigel subsequently filed suit, alleging wrongful termination in violation of public policy and intimidation in violation of R.C. Chapter 2921 et seq. MetroHealth moved for summary judgment, which the trial court granted.

{¶ 15} Heigel filed the instant appeal.

## II. Assigned Errors

I. The Trial Court erred as a matter of law when it determined no genuine issue of material fact existed and granted Appellees' Motion for Summary Judgment dismissing Heigel's claim for wrongful termination in violation of Ohio public policy and witness intimidation, when she was terminated on the heels of reporting multiple health and safety violations in Appellees' community health clinics.

II. The Trial Court erred as a matter of law when it determined that there is no clearly articulated Ohio public policy that requires Appellees in the management and operation of their community health clinics to maintain a clean and safe environment minimizing the risk of infection and contamination for its patients, who are residents of Ohio.

{¶ 16} Before we review this case on its merits, we initially address the problems in appellant's brief on appeal. App.R. 16(A) requires a separate argument for each assignment of error. Pursuant to App.R. 12(A)(2), an appellate court may disregard any assignment of error for which a separate argument has not been made. *See Tube City, Inc. v. Halishak*, 8th Dist. Cuyahoga No. 88287, 2007-Ohio-2118;

*Portsmouth v. Internatl. Assn. of Fire Fighters, Local 512*, 139 Ohio App.3d 621, 744 N.E.2d 1263 (4th Dist.2000). In Heigel's brief, the two assignments of error are not separately argued. The primary issue Heigel raises is whether the trial court erred in granting MetroHealth's motion for summary judgment. While App.R. 12(A)(2) permits this court to disregard assignments of error that are not separately argued, in the interest of judicial fairness, we will address the two assignments of error as one and determine whether the trial court erred in granting summary judgment in favor of MetroHealth.

### III. Law and Analysis

#### A. Standard of Review

{¶ 17} Appellate review of an award of summary judgment is de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Summary judgment is appropriate under Civ.R. 56 when (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. *Temple v. Wean United, Inc.,* 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977), citing Civ.R. 56(C). A court must view the facts in the light most favorable to the nonmoving party and must resolve any doubt in favor of the nonmoving party. *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 358-359, 604 N.E.2d 138 (1992).

#### B. At will Employment and Wrongful Discharge

{¶ 18} "In Ohio, the common-law doctrine of employment at will governs employment relationships." *Dohme v. Eurand Am., Inc.*, 130 Ohio St.3d 168, 2011-Ohio-4609, 956 N.E.2d 825, ¶ 11. However, a cause of action for wrongful discharge in violation of public policy may exist as an exception to the general rule regarding at will employment. *Id.*, citing *Painter v. Graley*, 70 Ohio St.3d 377, 639 N.E.2d 51 (1994), paragraph three of the syllabus, and *Greeley v. Miami Valley Maintenance Contrs., Inc.*, 49 Ohio St.3d 228, 551 N.E.2d 981 (1990), paragraph one of the syllabus.

{¶ 19} There are four elements that a plaintiff must establish to succeed on a claim of wrongful discharge in violation of public policy:

> (1) a clear public policy exists and is manifested in a state or federal constitution, in statute or administrative regulation, or in the common law (the clarity element), (2) dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element), (3) the plaintiff's dismissal was motivated by conduct related to the public policy (the causation element), and (4) the employer lacked an overriding legitimate business justification for the dismissal (the overriding-justification element).

(Internal citations omitted). *Sutton v. Tomco Machining, Inc.*, 129 Ohio St.3d 153, 2011-Ohio-2723, 950 N.E.2d 938, ¶ 9.

{¶ 20} The clarity and jeopardy elements involve questions of law. They encompass the determination of whether there is a public policy covering the conduct alleged in a case and whether that public policy is put in jeopardy by that conduct. *Rowe v. Hoist & Crane Serv. Group*, 8th Dist. Cuyahoga No. 110921, 2022-Ohio-3130, ¶ 23. The causation and overriding-justification elements involve

questions of fact. *Id.* The trial court concluded that Heigel could not satisfy any of the four elements of her wrongful discharge claim, but we note that a failure on any one of the elements is fatal to her claims. *See Dudley v. Siler Excavation Servs., LLC*, 2023-Ohio-666, 210 N.E.3d 580 (12th Dist.).

### i. Clarity Element

{¶ 21} To demonstrate the clarity element a plaintiff must show that he or she was disciplined or terminated "in contravention of a clear public policy articulated in the Ohio or United States Constitution, federal or state statutes, administrative rules and regulations, or common law." *Dohme*, 130 Ohio St.3d 168, 2011-Ohio-4609, at ¶ 25. It is the plaintiff's obligation to specify the sources of law that support the public policy upon which the plaintiff relies. *See id.* at ¶ 18.

{¶ 22} Heigel cites several state and federal statutes, the Ohio Administrative Code, and the Joint Commissions Standards for Ambulatory Care to support the clarity element. She also claims to rely on "related statutes, regulations, and standards for health care organizations, and Ohio common law" alleging MetroHealth engaged in the conduct and "subjected Plaintiff to unfair scrutiny and discipline, unlawfully administered employment policies and standards, scapegoated her, threatened her [,] and terminated her employment."

### 1. Joint Commission Standards[1]

---

[1] Heigel cites to the following Joint Commission Standards to support her claim: APR.01.02.01, APR.09.03.01, EC.02.04.03, EC.02.06.01, IC.02.02.01, IM.02.01.01, MM.05.01.11, LS.03.01.20, LS.03.01.30, and LS.03.01.70.

{¶ 23} Heigel argues that the Joint Commission standards provide the public policy that establishes the clarity element. Heigel was required to articulate a clear public policy by citation to specific provisions in the federal or state constitution, federal or state statutes, administrative rules and regulations, or common law. "The [Joint Commission] is a national organization which establishes standards for the operation of hospitals. It is not a government body." *Thompson v. Mem. Hosp.*, 925 F.Supp. 400, 409, n.10 (D.Md. 1996), and its regulations are not legislatively created. *State ex rel. Woods v. Oak Hill Med. Ctr.*, 91 Ohio St.3d 459, 462, 746 N.E.2d 1108 (2001).

{¶ 24} Heigel claims that "[c]ountless state and federal statutes and regulations embody the public policy of maintaining and protecting patient safety." This argument does not support Heigel's claim that the Joint Commission's standards constitute a source of Ohio public policy; it is Heigel's burden to identify the specific sources of public policy that apply to the facts of the case. *See Dohme*, 130 Ohio St.3d 168, 2011-Ohio-4609, 956 N.E.2d 825, at ¶ 19, 24; *Rowe*, 8th Dist. Cuyahoga No. 110921, 2022-Ohio-3130, at ¶ 30-31. Because the Joint Commission standards are not legislatively created or otherwise found in state or federal law, we find that they cannot be the basis of Heigel's claim that she has met the clarity element. Other states agree. *Rowe* at *id. See also Brintley v. St. Mary Mercy Hosp.*, 904 F. Supp.2d 699, 741 (E.D. Mich. 2012) (applying Michigan law and dismissing wrongful discharge in violation of public policy claim noting that there is "[n]o legal or statutory right [set forth] in the Joint Commission's standards, nor do the

standards constitute any 'right conferred by well-established legislative enactment.'"); *Turner v. Mem. Med. Ctr.*, 233 Ill.2d 494, 911 N.E.2d 369 (Ill. 2009) (finding that Joint Commission Standards are not Illinois law and "thus cannot be said to be representative of the public policy of the State of Illinois").

## 2. Ohio Revised Code

{¶ 25} Heigel also relies upon the following Ohio Revised Code sections: R.C. 2903.33, 2913.02, 3727.02 (and Chapter 3727 et seq.), 4101.11, and 4101.12.

{¶ 26} Not only is the burden on the plaintiff to "state with specificity the law or policy that would have been violated by the refusal to perform an employment action," *Sorensen v. Wise Mgt. Servs.*, 8th Dist. Cuyahoga No. 81627, 2003-Ohio-767, ¶ 32, but the plaintiff must also identify a public policy concern that applies to the facts of the case. *Rowe* at *id.*

{¶ 27} Heigel relies on R.C. 2903.33, which is a criminal statute that applies to care and residential facilities, which are defined as institutions that provide long-term care to dependent individuals. R.C. 2903.33(A)(1) - (6). Heigel's claims and allegations pertain to ambulatory clinics, which are not included in the statute. Moreover, the statute criminalizes abuse, neglect, and gross neglect, all of which involve knowingly or recklessly causing physical harm. R.C. 2903.33(B) - (C). Heigel has not alleged that MetroHealth knowingly or recklessly caused physical harm by abuse or neglect. Thus, the statute is inapplicable.

{¶ 28} Likewise, R.C. 2913.02, Ohio's theft statute, does not apply. R.C. 2913.02 provides that "no person, with purpose to deprive the owner of

property or services, shall knowingly obtain or exert control over either the property or services without consent, beyond the scope of consent, or by deception, threat, intimidation." R.C. 2913.02(A)(1) - (5). Heigel has not explained how this statute applies to her claims; we find that it does not.

{¶ 29} Heigel cites R.C. Chapter 3727, et seq., and specifically R.C. 3727.02. R.C. 3727.02 requires a hospital to be certified under Title XVIII of 42 U.S.C. 301, or "accredited by a national accrediting organization approved by the centers for [M]edicare and [M]edicaid services." Heigel has not argued that MetroHealth was in violation of this provision.

### 3. R.C. 4101.11 and 4101.12

{¶ 30} Heigel argues that she "clearly and unambiguously complained about dangerous conditions on the Appellees' business premises" and alleges she was fired for making the complaints. To support her claim, Heigel refers to her deposition testimony that there was "a bucket of dirty instruments" in the intake room, "numerous expired lab vials," "medications stored with cleaning supplies," a "piece of cardboard that had patient labels stuck all around it," "cultures sitting on the desk next to an open can of soda with a straw sticking out of it," "numerous expired medications," a clinic waiting room that had "dead plants" and "bugs flying all around," and a clinic lacked a proper utility room for soiled uniforms. Heigel further claims she "identified [ ] Joint Commission and patient privacy related issues" at the Old Brooklyn clinic, including the sizes of sinks and the placement of curtains in relation to sharps containers.

{¶ 31} In her complaint, Heigel alleges:

1. MetroHealth engaged in unsafe, hazardous conduct that violated company policies, standards applicable to health care organizations, and state and federal laws and regulations related to public health, safety, and patient privacy.

2. MetroHealth's noncompliance with the applicable laws and regulations related to health and safety was negatively impacting patient care and posed a substantial risk to patient and employee health and safety.

3. Heigel provided written complaints and documentary evidence of the unsafe conduct.

4. MetroHealth was noncompliant with laws and regulations related to the diversion of medication. Ms. Heigel reported that a MetroHealth physician was improperly diverting Covid-19 vaccines.

5. MetroHealth sites were noncompliant with numerous Joint Commission [s]tandards. Her reports related, but were not limited to, the presence of expired supplies, soiled utilities improperly near patients, dirty lab coats improperly kept in soiled utility rooms, boxes were overflowing in soiled utilities rooms, clean and dirty supplies commingled, and cardboard shipping boxes not properly disposed of as required.

6. MetroHealth employees were incorrectly performing procedures before the issuance of a physician's order.

7. MetroHealth employees were not taking reasonable steps to safeguard the protected health information of patients.

8. The reported conduct posed an unreasonable risk to the health and safety of MetroHealth employees and patients and violated multiple accreditation standards.

{¶ 32} This court has explained, "The duty owed to frequenters under R.C. 4101.11 and R.C. 4101.12 is no more than a codification of the common-law duty * * * that the premises be kept in a reasonably safe condition and warning be given of dangers of which the owner or occupier of the premises has knowledge." *Rettig*

*v. GMC*, 8th Dist. Cuyahoga No. 86837, 2006-Ohio-6576, ¶ 8, citing *Eicher v. United States Steel Corp.*, 32 Ohio St.3d 248, 249, 512 N.E.2d 1165 (1987). R.C. 4101.11 is "a codification of the common-law duty owed by the owner or occupier of premises to business invitees to keep [the] premises in a reasonably safe condition and to give warnings of latent or concealed perils of which [the owner or occupier] has, or should have, knowledge" and has long been recognized as a premises liability statute. *Rowe*, 8th Dist. Cuyahoga No. 110921, 2022-Ohio-3130, at ¶ 31, citing *Westwood v. Thrifty Boy Super Mkts., Inc.*, 29 Ohio St.2d 84, 86, 278 N.E.2d 673 (1972). R.C. 4101.12 is similar to R.C. 4101.11 and focuses on workplace safety.

{¶ 33} In *Rowe*, the plaintiff alleged that "untrained workers operat[ing] machinery subjected him and his coworkers to an unsafe work environment" and his employer failed to provide adequate personal protective equipment. *Id.* at ¶ 3, 5. This court upheld the trial court's finding that the plaintiff did not meet his burden to "cite to a specific source of public policy that is violated by [the employer's] conduct." *Id.* at ¶ 31. This court found that the plaintiff "fail[ed] to allege any safety issues covered by the public policy expressed in R.C. 4101.11. Furthermore, [the plaintiff] failed to either allege that [the employer] kept the premises in an unsafe condition or did not warn of latent or concealed perils." *Id.*

{¶ 34} Heigel relies on *Blackburn v. Am. Dental Ctrs.*, 2014-Ohio-5329, 22 N.E.3d 1149 (10th Dist.), where the court held that R.C. 4101.11 and 4101.12 establish

a clear public policy in Ohio favoring workplace safety for employees and frequenters.

{¶ 35} In this case, the trial court expressly declined to follow *Blackburn*, instead following then-established Eighth District precedent. The trial court's order granting summary judgment, however, was journalized shortly before this court issued *Rowe*.

{¶ 36} In *Rowe*, this court agreed with the reasoning in *Blackburn*, finding that considering R.C. 4101.11 and 4101.12 "together establish[es] that there exists a clear public policy that is manifested in a state or federal constitution, statute or administrative regulation in Ohio favoring workplace safety for employees and frequenters." *Rowe* at ¶ 30, citing *Blackburn*. However, the *Rowe* Court also agreed with the Sixth District's more limited view that the statute the plaintiff relies on "must identify a public policy concern that *applies to the facts of the case*." (Emphasis added.) *Rowe* at *id.*, citing *Whitaker v. First Energy Nuclear Operating Co.*, 6th Dist. Ottawa No. OT-12-021, 2013-Ohio-3856.

{¶ 37} Under her cause of action for wrongful discharge in violation of public policy, Heigel specified that she complained to MetroHealth regarding its conduct and non-compliance, which Heigel believed "was a hazard to the health and safety of employees, patients and the public," was "negatively impacting patient care[,] and posed a substantial risk to patient employee health and safety." Thus, Heigel claims that it was MetroHealth's conduct and non-compliance that violated public policy,

not that its premises were not kept in a reasonably safe condition or contained latent dangers.

{¶ 38} According to MetroHealth, the hospital system hired Heigel because she had Joint Commission experience and because it was in a survey window at the time of her hiring. Heigel was hired to identify and resolve issues like the ones she identified at the clinics. There is no evidence that MetroHealth failed to take Heigel's findings seriously; Rizer testified at deposition that she met Heigel on-site to resolve immediate concerns and the clinic's manager continued to work on the identified issues after their meeting. Contrary to Heigel's assertions on appeal, she did not allege in her complaint or other pleadings that MetroHealth's *premises* were in an unsafe condition, or dangerous due to concealed defects.

{¶ 39} Considering the above, Heigel's pleadings fail to allege safety issues covered by the public policy expressed in R.C. 4101.11 and 4101.12. Heigel failed to allege that MetroHealth kept its premises in an unsafe condition or did not warn of latent or concealed perils. Although a plaintiff may use summary judgment materials to flesh out the public policy relied upon, *Blackburn v. Am. Dental Ctrs.*, 2014-Ohio-5329, 22 N.E.3d 1149, ¶ 17 (10th Dist.), citing *Dohme*, 130 Ohio St.3d 168, 2011-Ohio-4609, 956 N.E.2d 825, neither Heigel's complaint nor her brief in opposition to summary judgment explain how a public policy exception in R.C. 4101.11 and 4101.12 apply to her claims. Consequently, Heigel fails to specify a public policy violation committed by MetroHealth under these provisions.

### 4. Administrative Code

{¶ 40} The Ohio Administrative Code also does not support Heigel's claims. Heigel cites to Ohio Adm. Code 4723-4-03 and 4723-4-04 (sets the standards for nurses); Ohio Adm. Code 4723-4-07 (requirement that nurses report and document nursing assessments, observations, and care provided, report errors in or deviations in orders, and promote a safe environment for patients) and Ohio Adm. Code 3701-84-07 (requires health care service providers to develop and follow patient care policies relating to the treatment of patients and informed consent).

{¶ 41} Again, *Dohme* requires a plaintiff to identify a specific statement of law to support a valid claim and to articulate, by citation, a specific public policy that the employer violated when the plaintiff was discharged. *Id*. at ¶ 19, 21. Heigel has failed to do so. She has not identified the statement of law that provides the public policy relevant to her claim, nor how MetroHealth violated any law or policy upon her discharge. We are reminded that

> the mere fact that a subject matter is covered by an administrative regulation and *may* serve as a basis for a public policy claim does not mean that each and every such regulation will be found to set forth a clear public policy. Accepting an argument that a clear public policy is established because an administrative regulation covers the subject matter at issue would expand the public policy claim to all statutory and administrative enactments. Under that view, the exception would swallow the rule.

(Emphasis sic.) *Hale v. Mercy Health Partners*, 20 F.Supp.3d 620, 639

(S.D.Ohio 2014).

### 5. Code of Federal Regulations ("C.F.R.") and United States Code ("U.S.C.")

{¶ 42} Heigel cites 42 C.F.R. 482.23, which requires "adequate personnel to provide nursing care to all patients as needed" as public policy designed for the delivery of safe patient care. She also cites 42 U.S.C. 299, et seq. and 42 U.S.C. 11101. Heigel has failed, however, to explain how these regulations are related to her claims. Instead, Heigel attempts to piggyback an alleged complaint about Joint Commission compliance issues to an alleged violation of 42 C.F.R. 482.23 by arguing that her specific concerns "directly implicate[d] the health of Cuyahoga County residents" and, therefore, implicated provisions of additional (unnamed) federal and state laws. As mentioned, Joint Commission standards are not law. As the trial court found, the public policy that warrants an exception to the at will doctrine must be of "uniform, statewide application." *Greenwood v. Taft*, 105 Ohio App.3d 295, 300, 663 N.E.2d 1030 (1st Dist.1995). Put another way, a plaintiff claiming wrongful discharge in violation of public policy may not rely on a city, county, or other political subdivision's law, rule, or policy to support his or her claim. *Id.*

{¶ 43} To find a clear public policy that precludes retaliation against employees who generally report alleged violations of Joint Commission standards or similar concerns would unnecessarily expand the public policy exception. Heigel's arguments are in essence an end-around the central issue of whether the content or context of her claims are subject to a clear public policy. Heigel has not met her burden of demonstrating the existence of such a clear public policy in this instance.

{¶ 44} This is not to be construed to mean that none of the provisions Heigel cited could serve as support for a wrongful discharge claim. We expressly stated in *Rowe*, 8th Dist. Cuyahoga No. 110921, 2022-Ohio-3130, at ¶ 30, that R.C. 4101.11 and 4101.12, taken together, establish that there is a clear public policy in Ohio favoring workplace safety. However, Heigel has failed to show any public policy exception applies to her claims.

{¶ 45} Considering the above, Heigel has failed to establish the existence of a clear public policy applicable to her and therefore has failed to meet her requisite burden of articulating a specific public policy that MetroHealth violated when it discharged her from employment.

### ii. Remaining Elements

{¶ 46} Having failed to satisfy the clarity element, Heigel has failed to establish a claim for wrongful termination in violation of public policy. *See Dohme*, 130 Ohio St.3d 168, 2011-Ohio-4609, 956 N.E.2d 825 at ¶ 26 (deciding that because the plaintiff failed to establish that his termination was in violation of a clear public policy, his action "must fail because establishment of the clarity element is essential to the survival of his remaining claims"). *See also Rowe* at ¶ 32. Thus, we need not decide whether Heigel has established any of the remaining elements to the public policy exception. *Dohme* at ¶ 26, citing *PDK Laboratories, Inc. v. United States Drug Enforcement Administration*, 360 U.S.App.D.C. 344, 362 F.3d 786 (C.A.D.C.2004) (Roberts, J., concurring in part and concurring in

judgment) ("[I]f it is not necessary to decide more, it is necessary not to decide more.").

{¶ 47} Accordingly, the trial court correctly granted summary judgment in favor of MetroHealth.

{¶ 48} The assignments of error are overruled.

{¶ 49} Judgment affirmed.

It is ordered that appellees recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHAEL JOHN RYAN, JUDGE

MARY EILEEN KILBANE, P.J., and
EMANUELLA D. GROVES, J., CONCUR