[Cite as *McJennett v. Lake Waynoka Property Owners*, 2013-Ohio-5767.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BROWN COUNTY

| | | |
|---|---|---|
| GLYWIN MCJENNETT, | : | |
| Plaintiff-Appellant, | : | CASE NO.  CA2013-05-006 |
| | : | O P I N I O N |
| - vs - | | 12/30/2013 |
| | : | |
| LAKE WAYNOKA PROPERTY OWNERS, et al., | : | |
| | : | |
| Defendants-Appellees. | : | |
| | : | |

CIVIL APPEAL FROM BROWN COUNTY COURT OF COMMON PLEAS
Case No. CVH20120322

Teresa Cunningham, 75 Cavalier Blvd., Suite 212, Florence, KY 41042, for plaintiff-appellant

Rendigs, Fry, Kiely & Dennis, LLP, Felix J. Gora, 600 Vine Street, Suite 2650, Cincinnati, Ohio 45202, for defendants-appellees, Lake Waynoka Property Owners & Paul Cahall

**RINGLAND, P.J.**

{¶ 1}  Plaintiff-appellant, Glywin McJennett, appeals a decision of the Brown County Court of Common Pleas granting summary judgment in favor of defendant-appellee, Lake Waynoka Property Owners Association (the Lake) in a wrongful discharge and intentional

infliction of emotional distress action.[1] For the reasons stated below, we affirm the judgment of the trial court.

{¶ 2} On April 9, 2012, McJennett filed a complaint against the Lake alleging wrongful discharge and intentional infliction of emotional distress. The Lake is a gated private community that is governed by a Homeowner's Association. McJennett was formerly employed by the Lake as both a ranger and a security guard. As a ranger, McJennett provided law enforcement to the Lake community and was legally obligated to guard and protect the property of the community's residents.[2] McJennett alleged that the Lake terminated his employment in violation of public policy because he was investigating potential criminal activity occurring at the Lake. These "crimes" involved the overuse of compensation time by a Lake employee and the potential misuse of a credit card by the general manager of the Lake, Paul Cahall. Further, McJennett contended that the Lake intentionally inflicted emotional distress upon him when they terminated his employment.

{¶ 3} The Lake moved for summary judgment on all of McJennett's claims. On April 19, 2013, the trial court granted summary judgment to the Lake finding that McJennett was not wrongfully discharged because there was no evidence that a crime was committed or that McJennett had the authority to investigate the alleged crime. Additionally, the court granted summary judgment on McJennett's intentional infliction of emotional distress claim reasoning that McJennett's termination was not outrageous because he was an at-will employee and could be terminated at any time.

{¶ 4} McJennett now appeals, raising two assignments of error.

{¶ 5} Assignment of Error No. 1:

---

1. Paul Cahall is also a defendant-appellee in this action.

2. Specifically, McJennett was a special constable. The duties of a special constable are specified in R.C. 1901.141(A)(2).

- 2 -

{¶ 6} THE TRIAL COURT ERRED BY GRANTING SUMMARY JUDGMENT REGARDING APPELLANT'S WRONGFUL DISCHARGE CLAIM.

{¶ 7} Assignment of Error No. 2:

{¶ 8} THE TRIAL COURT ERRED BY GRANTING SUMMARY JUDGMENT REGARDING APPELLANT'S CLAIMS OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

{¶ 9} McJennett challenges the trial court's grant of summary judgment on both his wrongful discharge and intentional infliction of emotional distress claims. This court reviews a trial court's decision on summary judgment under a de novo standard of review. *Fifth Third Mtge. Co. v. Bell*, 12th Dist. Madison No. CA2013-02-003, 2013-Ohio-3678, ¶ 24.

{¶ 10} Summary judgment is appropriate under Civ.R. 56 when (1) there is no genuine issue of material fact remaining to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor. *BAC Home Loans Serv., L.P. v. Kolenich*, 194 Ohio App.3d 777, 2011-Ohio-3345, ¶ 17 (12th Dist.), citing *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 369-370 (1998). The party requesting summary judgment bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Bell* at ¶ 24. Once a party moving for summary judgment has satisfied its initial burden, the nonmoving party must then rebut the moving party's evidence with specific facts showing the existence of a genuine triable issue; it may not rest on the mere allegations or denials in its pleadings. *Id.;* Civ.R. 56(E).

### Wrongful Discharge

{¶ 11} McJennett argues that summary judgment on his wrongful discharge action was

improper. Specifically, he asserts the trial court erred when it found that he could not prevail on his wrongful discharge claim because there was no evidence that a crime had been committed that required an investigation. McJennett contends the evidence established an employee misused compensation time and fraudulent charges occurred on the Lake's credit card. Additionally, McJennett argues that as a ranger who was in charge of law enforcement at the Lake, he had authority to investigate these crimes.

{¶ 12} In Ohio, the common-law doctrine of employment at-will governs employment relationships. The act of terminating an at-will employee's relationship with an employer usually does not give rise to an action for damages. *Dohme v. Eurand Am., Inc.*, 130 Ohio St.3d 168, 2011-Ohio-4609, ¶ 17, citing *Collins v. Rizkana*, 73 Ohio St.3d 65, 67 (1995). However, if an employee is discharged or disciplined in contravention of a clear public policy articulated in the Ohio or United States Constitution, federal or state statutes, administrative rules and regulations, or common law, a cause of action for wrongful discharge in violation of public policy may exist as an exception to the general rule. *Painter v. Graley*, 70 Ohio St.3d 377 (1994), paragraph three of the syllabus.

{¶ 13} To establish a prima facie claim of wrongful discharge in violation of public policy, the employee must demonstrate the following four elements:

> 1. That clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).
>
> 2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).
>
> 3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).
>
> 4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).

(Emphasis sic.) *Collins* at 69-70, quoting *Painter* at fn. 8.

{¶ 14} The clarity and jeopardy elements involve questions of law, whereas the causation and overriding justification elements involve questions of fact. *Rose v. CTL Aerospace, Inc.*, 12th Dist. Butler No. CA2011-09-171, 2012-Ohio-1596, ¶ 22, citing *Collins* at 70.

{¶ 15} McJennett argues that he was terminated from his employment at the Lake in violation of the public policy of encouraging employees and law enforcement officials to investigate and report potential crimes that occur at the workplace. The Ninth District has recognized that "a clear public policy does exist in favor of reporting crimes and preventing the escalation of crimes * * *." *McKnight v. Goodwill Industries of Akron, Inc.*, 9th Dist. Lorain No. 99CA007504, 2000 WL 1257810, *6 (Sept. 6, 2000). *See Bailey v. Priyanka Inc.*, 9th Dist. Summit No. 20437, 2001-Ohio-1410; *Armstrong v. Trans-Service Logistics, Inc.*, 5th Dist. Coshocton No. 04CA015, 2005-Ohio-2723. Additionally, there is a "public policy that police officers must uphold or enforce the laws of the state of Ohio." *Alexander v. Cleveland Clinic Found.*, 8th Dist. Cuyahoga No. 95727, 2012-Ohio-1737, ¶ 34. *See Smith-Johnston v. Cincinnati*, 1st Dist. Hamilton No. C-050723, 2006-Ohio-3510, ¶ 14. Therefore, we agree with McJennett that a clear public policy exists to encourage law enforcement officials to investigate and report crimes that occur at their workplace. Our inquiry now turns to whether dismissing McJennett under the present circumstances would jeopardize this public policy.

{¶ 16} The evidence established the following facts. In his deposition and affidavit, McJennett explained that he was hired by the Lake in the summer of 2011 as a ranger. As a ranger, McJennett was responsible for law enforcement at the Lake. Initially, McJennett worked solely as a ranger, however in the fall McJennett also began working as a security guard. For McJennett's role as a ranger, he reported to Cahall regarding updates and status of police reports.

{¶ 17} In September 2011, McJennett discovered that a Lake employee was taking

unauthorized compensation time. As a part of his law enforcement duties, McJennett began an investigation of the potential theft committed by the employee. After his investigation, McJennett reported to Cahall and a Homeowner's Association board member regarding the compensation time issue. Cahall informed McJennett that he was aware of the matter and would take care of it. In November, McJennett conducted another investigation regarding fraudulent charges on the Lake's credit card. The Lake had a credit card in which Cahall was the primary user and McJennett discovered that charges were made on the card from Saudi Arabia. McJennett overheard Cahall contact the credit card company regarding the charge and during this call, Cahall told the credit card company that he had not been overseas and that the card had never been used. Thereafter, McJennett overhead Cahall tell a Homeowner's Association member that he had been overseas. Due to Cahall's inconsistent statements, McJennett began an investigation of Cahall for potential misuse of a credit card.

{¶ 18} McJennett testified that during his employment at the Lake, his law enforcement files were interfered with on two occasions. McJennett explained that initially he kept his files at the Lake's office but moved these files to his ranger cruiser after he noticed that some files were missing. McJennett's files were also meddled with shortly before he was terminated. He stated that on November 17, 2011 he observed a Lake employee on his property without his permission. The employee looked through the windows of his home and garage and then went into his cruiser. After the employee left, McJennett discovered that some of his investigative files kept in his cruiser were missing.

{¶ 19} Shortly after McJennett discovered the Lake employee on his property looking through his files, he contacted the Homeowner's Association president and told him he needed to schedule a meeting with the board to discuss his investigations regarding the compensation time and credit card matters. The next day McJennett's employment at the Lake ceased. Cahall met with McJennett and informed him that the Lake could not afford his

salary and his position would be terminated. McJennett also stated that Cahall asked him why he was speaking to Homeowner Association board members and several Lake residents were complaining about McJennett's financial issues. Shortly after McJennett's termination, another person was hired as the Lake's ranger.

{¶ 20} Cahall testified regarding McJennett's employment at the Lake. Cahall explained that he is the general manager of the Lake and directly or indirectly supervises all of the Lake's employees. Cahall refuted McJennett's characterization of the compensation time and credit card issues as criminal matters. Cahall explained that he was aware of the compensation time issue before McJennett went to him. He stated that he believed it was solely an administrative issue and contacted the employee and resolved the matter. Additionally, Cahall denied that he made the charges on the Lake's credit card. He explained that the charges were made by an unknown party in Saudi Arabia and that once he became aware of the charge, he contacted the credit card company for a refund. He testified that while he was in Jamaica in 2011 he never visited Saudi Arabia. Ultimately, the credit card company refunded the amount.

{¶ 21} Cahall also testified regarding the circumstances surrounding McJennett's termination from the Lake. He stated that he spoke to McJennett regarding the problems he had at the Lake. He stated that McJennett had failed to show up to work on time on several occasions, which McJennett acknowledged. Ultimately, Cahall told McJennett that the budget could not accommodate him and told McJennett that he had to be laid off. Cahall stated that he gave McJennett several options regarding his employment at the Lake including continuing to work part-time as a police officer, working part-time as a police officer and a security guard on final notice, or choosing to voluntarily be laid off and collect unemployment. McJennett chose to be laid off.

{¶ 22} The public policy exception of reporting and investigating crimes is inapplicable

to the case at bar because dismissing McJennett under the circumstances that existed at the time did not *jeopardize* the public policy of investigating or reporting a crime as the evidence established that McJennett was not investigating a crime nor did he have the authority to continue on the with investigation. The evidence established that the two "crimes" McJennett was investigating were resolved by the Lake. Cahall and some Homeowner Association board members were aware of the potential crimes. While McJennett had the authority to investigate the overuse of compensation time and the fraudulent credit card charges, these issues were resolved. Cahall, as the general manager, supervised employees, was made aware of the compensation time issue, and resolved the issue by talking to the individual employee. Cahall testified that the compensation time issue was an administrative matter and was handled administratively. During his deposition, McJennett acknowledged that Cahall would determine each employee's entitlement to compensation time. Additionally, the credit card issue was also resolved. Cahall contacted the credit card company which refunded the amount. While Cahall might have made inconsistent statements regarding whether he was overseas, this does not amount to a potential crime regarding the credit card charges. The board was also aware of the credit card charges.

{¶ 23} In both of these instances, the victim of the crimes, the Lake, was made aware of the issues and chose to handle these matters administratively. McJennett chose not report these alleged crimes to any law enforcement official who could have taken action. McJennett's behavior after these matters had been resolved was outside his position as a constable and essentially usurped Cahall's position as general manager of the Lake and the board's power over the Lake. Under these circumstances it is clear that McJennett's behavior did not further the stated policy in this case. *See Smith-Johnston*, 1st Dist. Hamilton No. C-050723, 2006-Ohio-3510 (police officer was not fired in violation of policy to conduct accurate investigations when manager was aware of the issue, had ultimate authority over

issue, and officer usurped her position). Therefore, we find that the trial court did not err in granting summary judgment on McJennett's wrongful discharge claim.

{¶ 24} McJennett's first assignment of error is overruled

### Intentional Infliction of Emotional Distress

{¶ 25} McJennett also challenges the grant of summary judgment on his intentional infliction of emotional distress claim. Specifically, McJennett argues the trial court erred when it found that the Lake was not liable under an intentional infliction of emotional distress theory because McJennett was an at-will employee and could be fired at any time. McJennett contends that the mere fact that he was an at-will employee does not bar his action and that the Lake's behavior in terminating McJennett was outrageous.

{¶ 26} In order to survive summary judgment on an intentional infliction of emotional distress claim, McJennett was required to show that: (1) the Lake either intended to cause emotional distress or knew or should have known the actions taken would result in serious emotional distress to McJennett; (2) the Lake's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community; (3) the Lake's actions were the proximate cause of McJennett's psychic injury; and (4) the mental anguish suffered by McJennett is so serious and of a nature that no reasonable man could be expected to endure it. *Ward v. Oakley*, 12th Dist. Butler No. CA2013-03-031, 2013-Ohio-4762, ¶ 35.

{¶ 27} "A former employee may not recover damages from his previous employer and supervisor for intentional infliction of emotional distress allegedly caused by the employee's discharge from his at-will employment." *Foster v. McDevitt*, 31 Ohio App.3d 237, 239 (2d Dist.1986). *See Dixon v. Mercantile Stores, Co. Inc.*, 12th Dist. Butler No. CA90-10-214, 1991 WL 153194, *4 (Aug. 12, 1991). An employer is not liable for a plaintiff's emotional distress if the employer does no more than insist upon his legal rights in a permissible way,

even though he is well aware that such insistence is certain to cause emotional distress. *Mendlovic v. Life Line Screening of America, LTD.*, 173 Ohio App.3d 46, 2007-Ohio-4674 (8th Dist.), ¶ 49, quoting *Foster* at 239.

{¶ 28} In the present case, McJennett was an at-will employee of the Lake, and thus could be terminated with or without cause at any time, as long as state or federal law was not violated. McJennett fails to adduce any material facts which would create a genuine issue so as to withstand summary judgment on his claim for intentional infliction of emotional distress. The Lake's action in terminating McJennett did not constitute "outrageous conduct" because in deciding to terminate McJennett, the Lake did nothing more than exercise its legal rights.

{¶ 29} McJennett argues that the Ohio Supreme Court has rejected the proposition that terminating an at-will employee can never constitute intentional infliction of emotional distress. *Russ v. TRW. Inc.*, 59 Ohio St.3d 42 (1991). In *Russ*, an at-will employee brought an intentional infliction of emotional distress claim against his employer for the harm he suffered as a result of his discharge *as well as* the "circumstances surrounding his discharge," including the employer's false characterization of the employee as participating in unlawful activity, a federal investigation regarding this accusation, and the prospect of engaging in an undercover investigation of his former co-workers. *Id.* at 47. The Supreme Court found that the employee could proceed on his intentional infliction of emotional distress claim even though he was an at-will employee. *Id.* In so holding, the Court noted that "an action predicated on intentional infliction of emotional distress brought by an at-will employee against his employer is not foreclosed merely because his discharge from employment was obtained in a lawful manner." *Id.* at 49.

{¶ 30} McJennett argues that *Russ* overruled the previous law which prohibited intentional infliction of emotional distress actions for at-will employees. However, we disagree with this analysis. While *Russ* allowed an at-will employee to proceed on his

intentional infliction of emotional distress action, the employee alleged that he suffered emotional distress from "the circumstances surrounding his discharge." The Second District has noted that *Russ* based its holding on the fact that the *proximate cause* of the emotional distress suffered by the employee was not limited to the mere fact of his discharge but instead included the other facts of his employment such as the outrageous conduct of a falsely accusing an employee of engaging in unlawful activity. *Dunina v. LifeCare Hosps. of Dayton*, 2d Dist. Montgomery No. 21142, 2006-Ohio-2824, ¶ 35. Therefore, an at-will employee may only recover under intentional infliction of emotional distress when he alleges that the injury he suffered was proximately caused by the circumstances surrounding his discharge. An at-will employee may not recover under intentional infliction of emotional distress when he only alleges that he suffered harm as a result of his discharge.

{¶ 31} In this case, the alleged harm suffered by McJennett is limited to that produced by his discharge. Specifically, in McJennett's motion for summary judgment he alleges that "the termination was the cause of [McJennett's] anxiety and depression" and that "the termination was the proximate cause of [McJennett]s psychic injury." Therefore, as a matter of law, McJennett may not recover from the Lake for intentional infliction of emotional distress caused solely by his discharge from his at-will employment.

{¶ 32} Additionally, and perhaps more importantly, the Lake's actions in terminating McJennett did not constitute outrageous conduct. McJennett alleged that the Lake's behavior was outrageous because Cahall fabricated excuses to terminate McJennett, questioned McJennett's co-workers about his behavior, told McJennett's co-workers that he was a bad person, and offered McJennett's co-workers special treatment if they reported on McJennett's activities. As we noted above, because McJennett was an at-will employee, the Lake had the privilege to terminate McJennett's employment at any time, even if it fabricated "excuses" to terminate McJennett. Additionally, McJennett's allegations do not rise to the

level of outrageous conduct.

{¶ 33} The Ohio Supreme Court has held,

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. * * * the liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. * * * [P]laintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt.

*Curry v. Blanchester*, 12th Dist. Clinton No. CA2009-08-010, 2010-Ohio-3368, ¶ 53, quoting *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 374-375 (1983). Here, McJennett's allegations do not delineate any conduct that could rationally be considered extreme or outrageous so as to support an action for emotional distress. *See Mendlovic*, 173 Ohio App.3d 46, 2007-Ohio-4674, ¶ 49.

{¶ 34} Thus, the trial court did not err in granting summary judgment on McJennett's intentional infliction of emotional distress claim. McJennett's second assignment of error is overruled.

## Conclusion

{¶ 35} The trial court did not err in granting summary judgment on McJennett's wrongful discharge action because dismissing McJennett under the circumstances that existed at the time did not jeopardize the public policy of investigating or reporting a crime. Additionally, summary judgment was proper on McJennett's intentional infliction of emotional distress claim because an employer is not liable for the infliction of emotional distress caused solely by the discharge of an at-will employee. Lastly, we note that while the Lake argued that several pieces of evidence attached to McJennett's motion in opposition for summary judgment were improper, these arguments are moot as we have affirmed the trial court's

decision granting summary judgment to the Lake.

**{¶ 36}** Judgment affirmed.

PIPER and M. POWELL, JJ., concur.