[Cite as *Petras v. 3G Operating Co.*, 2021-Ohio-473.]

# IN THE COURT OF APPEALS

## ELEVENTH APPELLATE DISTRICT

## LAKE COUNTY, OHIO

| | | |
|---|---|---|
| CHERYL A. PETRAS, | : | **O P I N I O N** |
| Plaintiff-Appellant, | : | |
| - vs - | : | **CASE NO. 2020-L-084** |
| 3G OPERATING COMPANY, LLC d.b.a. WICKLIFFE COUNTRY PLACE, | : | |
| | : | |
| Defendant-Appellee. | : | |
| | : | |

Civil Appeal from the Lake County Court of Common Pleas, Case No. 2019 CV 001239.

Judgment: Affirmed.

*Frank Consolo*, Consolo Law Firm Co., LPA, 627 West St. Clair Avenue, Cleveland, OH 44113 (For Plaintiff-Appellant).

*Katie Lynn Zorc*, Reminger Co., LPA, 101 West Prospect Avenue, Suite 1400, Cleveland, OH 44115 (For Defendant-Appellee).

MATT LYNCH, J.

{¶1} Plaintiff-appellant, Cheryl A. Petras, appeals from the decision of the Lake County Court of Common Pleas, granting summary judgment in favor of defendant-appellee, 3G Operating Company, d.b.a. Wickliffe Country Place ("Wickliffe"). For the following reasons, we affirm the decision of the lower court.

{¶2} On August 2, 2019, Petras filed a Complaint against Wickliffe. The Complaint alleged that she was employed by Wickliffe, a nursing home facility, as a Shift

Supervisor Registered Nurse and was wrongfully discharged for her conduct relating to the care of two patients, Jane Doe and Janet Roe. The Complaint alleged that firing her for taking actions as a registered nurse engaged in the practice of nursing violates "clear Ohio public policy that registered nurses not be interfered with, or prevented from, engaging in the practice of nursing and providing nursing care to individuals as set forth in R.C. Chapter 4723 and OAC Chapter 4723."

{¶3} Wickliffe filed an Answer on September 6, 2019.

{¶4} On March 13, 2020, Wickliffe filed a Motion for Summary Judgment. Wickliffe argued that Petras was properly terminated as an at-will employee and that the public policy exception to the at-will employment doctrine did not apply. It contended that the public policy cited in the Complaint, i.e., the policy that "registered nurses not be interfered with," is too general to satisfy the clarity element of a wrongful discharge for public policy claim. It further argued that the jeopardy element was not satisfied because there are alternative means of promoting public policy through federal and state regulation of nursing homes and there was a legitimate business justification for Petras' termination due to her failure to follow Wickliffe's policies and procedures.

{¶5} Pursuant to the deposition testimony, Petras worked as a second shift Registered Nurse supervisor at Wickliffe Country Place, from April 2018 through January 8, 2019, when she was terminated. Petras testified that, in this position, she essentially "ran the show" on the night shift, making rounds and assisting shift nurses. Her supervisor was unit manager Danielle Lewis, who worked during the day. Petras testified that if she needed assistance or there was a change in condition of a patient, she would contact Lewis.

{¶6} Around December 2018, Wickliffe began utilizing a telemedicine program

2

called TripleCare, which was used to consult with TripleCare doctors virtually after normal business hours. Pursuant to the TripleCare policy adopted by Wickliffe, nurses were generally required to utilize this program, rather than contact the patient's personal physician, during the hours of 6 p.m. to 7 a.m. on weekdays as well as during all weekend hours. Petras attended a training meeting on TripleCare prior to its implementation and received a handout outlining its policies for use, which stated the foregoing times and a list of instances when TripleCare physicians should not be called, including for routine labs, chronic pain, and skin tears, as well as reasons they should be called, including fever, GI distress, and other symptoms of illness.

{¶7} On January 2, 2019, Petras was working with a chronically ill patient, Jane Doe. Petras had collected blood cultures from her central line pursuant to the request of Doe's primary doctor, Dr. Balaiji. When Petras received the positive results from the lab, indicating an infected central line, she called Dr. Balaiji directly, who said to get Doe to the hospital immediately. She testified that although this occurred "after hours," i.e., during the time of TripleCare use, she did not feel it appropriate to use TripleCare to discuss a lab result and knew the patient needed treatment at a hospital. Petras believed she did not contact Lewis until after Doe was sent to the hospital; Lewis confirmed she was notified by a text message from Petras after the patient was sent out.

{¶8} Donna Fording, an LPN at Wickliffe, had assisted with training for TripleCare. She testified that she spoke with Petras on the day following the January 2 incident and discussed that Petras had not used the telemedicine program properly and reminded her she needed to notify the unit manager before calling the primary doctor.

{¶9} On January 4, 2019, Petras became aware that a patient, Janet Roe, had not been taking her medication, eating, or drinking, and had loose stool and green vomit.

3

She called Roe's physician, Dr. Mehta, who stated that Roe needed to go to the hospital. Petras believed she told Lewis about the circumstances after she made arrangements to send Roe to the hospital. Lewis testified that she received the following message on January 4: "Dr. Mehta wants to send [Janet Roe] to ER, not drinking or drinking all day (sic), had green emesis on day shift, fever 101.2," and Lewis responded "okay."

{¶10} On January 7, 2019, Petras was called into the office of JoAnne Ginley, the director of nursing. According to Petras, Ginley told her she would be suspended pending investigation due to "violating protocol" and referenced sending patients out of the facility, but was not more specific. Petras was subsequently notified via phone call that she was fired. Petras did not believe she violated protocol and, in her affidavit, attested to taking the actions she did because Doe and Roe were in urgent, life-threatening situations requiring admission to a hospital.

{¶11} Ginley testified that Petras was terminated for "not following the procedure for contacting TripleCare after hours and not contacting the unit manager" as to Doe and not contacting the unit manager as to Roe. She testified that Petras had been present at the TripleCare training and that nurses had been informed in the past that they should contact their unit manager before sending a patient out of the facility. Lewis testified she had been told about the policy of contacting the unit manager at her orientation and Ginley stated that there was periodic training at Wickliffe on policy to notify the unit manager before calling a doctor. No written policy regarding contacting the unit manager was established. In an affidavit, Petras denied the existence of a policy that required her to contact the unit manager if there was a medical problem with a resident under her care.

{¶12} Petras filed a Memorandum in Opposition on May 1, 2020, arguing all elements were met for a claim of wrongful discharge in violation of public policy. She

4

contended that multiple sections of the Revised Code demonstrate the public policy that registered nurses should not be interfered with while providing care to their patients in accordance with nursing standards. She further contended that the reason for her termination was to keep the return to hospital rates low, which improperly places profits above medical care.

{¶13} Wickliffe filed a Reply in Support on May 7, 2020.

{¶14} On June 23, 2020, the trial court issued a Judgment Entry granting summary judgment in favor of Wickliffe. The court held that "the standards and requirements for practice as a registered nurse" set forth in R.C. Chapter 4723 and Ohio Adm.Code Chapter 4723 "do not demonstrate a clear public policy that an employer cannot terminate a registered nurse based upon a decision he or she makes in the practice of nursing" or that a nurse cannot be "interfered with or prevented from engaging in the practice of nursing and providing nursing care to individuals." It determined that these sections do not demonstrate a public policy against terminating a nurse for failing to follow the chain of command or instructions to utilize telemedicine. It found no exception to Petras' status as an at-will employee and that Wickliffe was entitled to judgment as a matter of law.

{¶15} Petras timely appeals and raises the following assignment of error:

{¶16} "The trial court committed prejudicial error in granting the motion of summary judgment of the Appellee, as a matter of law, based on its opinion that Petras failed to establish the clarity element of her public policy wrongful discharge claim."

{¶17} Pursuant to Civil Rule 56(C), summary judgment is proper when (1) the evidence shows "that there is no genuine issue as to any material fact" to be litigated, (2) "the moving party is entitled to judgment as a matter of law," and (3) "it appears from the

5

evidence * * * that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence * * * construed most strongly in the party's favor."

{¶18} A trial court's decision to grant summary judgment is reviewed by an appellate court under a de novo standard of review. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). "A de novo review requires the appellate court to conduct an independent review of the evidence before the trial court without deference to the trial court's decision." *Peer v. Sayers*, 11th Dist. Trumbull No. 2011-T-0014, 2011-Ohio-5439, ¶ 27.

{¶19} "As a general proposition, an employment-at-will relationship can be terminated by either side for any reason at any time." *Guardo v. University Hosp., Geauga Med. Center*, 11th Dist. Geauga No. 2014-G-3178, 2015-Ohio-1492, ¶ 20. However, "an exception to the employment-at-will doctrine is justified where an employer has discharged his employee in contravention of a 'sufficiently clear public policy.'" *Painter v. Graley*, 70 Ohio St.3d 377, 384, 639 N.E.2d 51 (1994).

{¶20} The elements necessary to demonstrate a claim for wrongful discharge in violation of public policy are:

{¶21} "'1. That clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).

{¶22} "'2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).

{¶23} "'3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).

6

{¶24} "'4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).'" (Emphasis sic.) (Citation omitted.) *Id.* at 384, fn. 8; *Dohme v. Eurand Am., Inc.*, 130 Ohio St.3d 168, 2011-Ohio-4609, 956 N.E.2d 825, ¶ 12-16.

{¶25} "The clarity and jeopardy elements of the *Painter* test are issues of law for the court's determination; the causation and overriding-justification elements are questions for determination by the fact-finder." *Dohme* at ¶ 17.

{¶26} Here, the trial court found that the first element, the clarity element, was not met and dismissed based on that element alone.

{¶27} The existence of a public policy is derived from specific sources, including state statutes, administrative regulations, and the common law. *Id.* at ¶ 18. "[A] public policy sufficient to overcome the presumption in favor of employment at will is not limited to instances in which the statute expressly forbids termination, but may be discerned from legislation generally, or from other sources of law." *Jacobs v. Highland Cty. Bd of Commrs.*, 2014-Ohio-4194, 20 N.E.3d 300, ¶16 (4th Dist.), citing *Painter,* 70 Ohio St.3d at 384, 639 N.E.2d 51. The court in *Painter* explained that, while a sufficiently clear public policy exists where the General Assembly adopted a "specific statute forbidding an employer from discharging or disciplining an employee," other exceptions may be recognized where the public policy "could be deemed to be 'of equally serious import as the violation of a statute.'" *Id.* at 382, citing *Greeley v. Miami Valley Maintenance Contrs., Inc.*, 49 Ohio St.3d 228, 235, 551 N.E.2d 981 (1990). The public policy exception to the at-will doctrine has been "narrowly applied." *McGlothen v. Fairborn*, 2019-Ohio-141, 127 N.E.3d 527, ¶ 18 (2d Dist.).

{¶28} Petras cites several portions of the Ohio Revised Code and Ohio

Administrative Code in support of her contention that there is a clear public policy that registered nurses cannot be, in her characterization, "interfered with, or prevented from, engaging in the practice of nursing and providing nursing care to individuals." We will briefly review the sections she cites in support of this asserted policy.

{¶29} Chapter 4723 of the Ohio Revised Code is entitled "Nurses" and includes sections which address, inter alia, the Board of Nursing, licensing, tasks to be performed by nurses, and discipline. R.C. 4723.01 defines a registered nurse as one who holds a license that "authorizes the practice of nursing as a registered nurse," which is "providing to individuals and groups nursing care requiring specialized knowledge, judgment, and skill derived from the principles of biological, physical, behavioral, social, and nursing sciences." R.C. 4723.01(A) and (B). Nursing care includes, in pertinent part, "[i]dentifying patterns of human responses to * * * health problems amenable to a nursing regimen; * * * [e]xecuting a nursing regimen through * * * nursing actions; * * * [a]ssessing health status for the purpose of providing nursing care; * * * [and] administering medications, treatments, and executing regimens" as authorized. R.C. 4723.01(B)(1)-(3) and (5).

{¶30} R.C. 4723.07 sets forth the powers of the Board of Nursing to establish standards for nursing programs, licensure, and continuing education rules for the practice of nursing, precautions to be taken by nurses, quality assurance standards for advanced practice registered nurses, and allows it to adopt other rules as necessary. R.C. 4723.28 provides the circumstances under which sanctions may be imposed upon a nurse, including denying, revoking, suspending, or placing restrictions on a nursing license.

{¶31} Ohio Adm.Code 4723-4-03 describes the standards for competent practice of registered nursing, requiring that nurses maintain knowledge of duties of safe nursing practice and demonstrate competence and accountability in all areas of practice including

8

consistent performance of nursing and referral and consultation when a complication arises. Ohio Adm.Code 4723-4-03(A)-(C). It allows a nurse to provide care beyond "basic nursing preparation" when the nurse has obtained education and demonstrated skills as to that type of care. Ohio Adm.Code 4723-4-03(D). It provides that registered nurses shall, "in a timely manner, * * * [i]mplement any order for a patient unless the registered nurse believes or should have reason to believe the order is" inaccurate, not properly authorized, not current or valid, harmful, or contraindicated by other documented information. Ohio Adm.Code 4723-4-03(E)(1). Similarly, the nurse shall "[c]larify any order" for a patient the nurse believes meets the foregoing criteria. Ohio Adm.Code 4723-4-03(E)(2). Finally, it states that a registered nurse "shall use acceptable standards of safe nursing care as a basis for any observation, advice, instruction, teaching, or evaluation and shall communicate information which is consistent with acceptable standards of safe nursing care." Ohio Adm.Code 4723-4-03(J).

{¶32} Ohio Adm.Code 4723-4-06, entitled "Standards of nursing practice promoting patient safety," provides that a nurse shall report and document nursing assessments, observations, and care provided, shall report errors in or deviations for a current valid order to the appropriate practitioner, and shall "implement measures to promote a safe environment for each patient." Ohio Adm.Code 4723-4-06(E), (F) and (H).

{¶33} Ohio Adm.Code 4723-4-07(A) sets forth standards for applying the nursing process, which include accurately and timely collecting and documenting data, establishing nursing diagnoses and reporting the patient's health to the health care team, developing a nursing plan of care, implementing a nursing regimen and evaluating a response to the nursing intervention.

9

{¶34} The statutes and administrative code sections cited by Petras do not specifically discuss interference with or prevention of providing nursing care. They primarily address the regulation of the nursing practice and licensure, and what tasks and treatments nurses are required or permitted to perform as a licensed nurse. These generally demonstrate an intent to ensure patients receive proper treatment and that unlicensed and unqualified nurses do not provide care rather than a policy against "interference" with nurses. *See Freie v. Ohio Bd. of Nursing*, 10th Dist. Franklin No. 90AP-336, 1990 WL 126288, *2 (Aug. 30, 1990) ("[w]e must assume that the statutes controlling the nursing profession are meant to enforce the public policy of insuring that only the competent and trustworthy provide nursing services in Ohio").

{¶35} We are unaware of, and Petras does not cite to, any case law or statutory interpretation or history that supports her understanding of the statute and its application to create the claimed public policy. An asserted public policy should be clear and supported by citations to specific authority. *See Dohme*, 130 Ohio St.3d 168, 2011-Ohio-4609, 956 N.E.2d 825, at ¶ 21 (the plaintiff must cite a "specific statement of law in support of his claim" that an applicable public policy existed); *Dean v. Consol. Equities Realty #3, L.L.C.*, 182 Ohio App.3d 725, 2009-Ohio-2480, 914 N.E.2d 1109, ¶ 12 (1st Dist.) ("the public policy against the alleged conduct of [the defendant] is not manifested clearly enough to warrant abrogating the at-will-employment doctrine"). While Petras cites to many specific code sections, they simply do not provide support for her conclusion as to what the applicable public policy is.

{¶36} In particular, Petras highlights the applicability of Ohio Adm.Code 4723-4-03(E), emphasizing that it states a registered nurse shall implement an order unless the nurse believes it is harmful to the patient or contraindicated by other documented

10

information and shall clarify an order in such circumstances. Again, this appears to be a direction included for the purpose of protecting the patient, allowing the nurse to provide a check against a mistaken or errant order for medical treatment, rather than the policy of preventing "interference" with conducting nursing duties. Further, while this provision ensures that a nurse does not implement an order that is dangerous to the patient, at issue here was not Petras' conduct in carrying out "any order for a patient" but whether she could be fired for failing to follow her employer's policies.

{¶37} Petras also emphasizes that she was acting in accordance with R.C 4723.01(B)(5) by administering treatments authorized by Dr. Balaiji in regard to Jane Doe. This does not demonstrate the alleged public policy regarding "interference" with her duties; instead, it demonstrates only that she was not acting to provide treatment unauthorized by the Revised Code. Further, it does not demonstrate any public policy prohibiting her employer from creating additional rules to follow when providing such treatments.

{¶38} Even if we were to determine that the authority cited did support a public policy "that registered nurses not be interfered with or prevented from engaging in the practice of nursing and providing nursing care" as Petras contends, we do not hold that such policy is implicated simply because an employer created certain policies and procedures that a nurse must follow in carrying out her duties as an employee. In other words, requiring a nurse to consult with her superiors on action to be taken regarding a patient and to utilize a certain procedure to discuss patient conditions with qualified physicians does not interfere with her ability to give a patient care. It merely sets forth procedures that must be followed in providing that care, neither of which are particularly onerous. Where the public policy cited does not specifically apply to the facts of the case,

11

the plaintiff fails to meet the clarity element. *Strodtbeck v. Lake Hosp. Sys., Inc.*, 11th Dist. Lake No. 2010-L-053, 2011-Ohio-2327, ¶ 31.

{¶39} Since Petras failed to meet the clarity element and failure to meet any element results in the inapplicability of the public policy exception, the trial court properly found the wrongful termination lawsuit must be dismissed on summary judgment. No further consideration of the remaining elements is required. *Guardo*, 2015-Ohio-1492, at ¶ 48 ("[g]iven the outcome of our analysis as to [the] first element, it is not necessary to address whether appellant's summary judgment submission was sufficient to satisfy the 'jeopardy' and 'overriding justification' elements of her wrongful discharge claim").

{¶40} The sole assignment of error is without merit.

{¶41} For the foregoing reasons, the judgment of the Lake County Court of Common Pleas, granting summary judgment in favor of Wickliffe, is affirmed. Costs to be taxed against appellant.


MARY JANE TRAPP, P.J.,

CYNTHIA WESTCOTT RICE, J.,

concur.