[Cite as *Dudley v. Siler Excavation Servs., L.L.C.*, 2023-Ohio-666.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| BRANDIE DUDLEY, | : | |
| Appellant, | : | CASE NO. CA2022-06-030 |
| | : | O P I N I O N |
| - vs - | | 3/6/2023 |
| | : | |
| SILER EXCAVATION SERVICES, LLC, | : | |
| Appellee. | : | |

CIVIL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2021-CVH-00907

Finney Law Firm, LLC, and Stephen E. Imm and Matthew S. Okiishi, for appellant.

McCaslin, Imbus & McCaslin, and Michael P. Cussen and R. Gary Winters, for appellee.

**PIPER, P.J.**

{¶1} Appellant, Brandie Dudley, appeals a decision of the Clermont County Court of Common Pleas granting a Civ.R. 12(B)(6) motion to dismiss in favor of appellee, Siler Excavation Services, L.L.C.

{¶2} Dudley was an employee of Siler Excavation. She began her employment in December 2020 performing various duties, including human resource responsibilities and

managing payroll. In August 2021, a co-worker named Blake left work early due to illness. Blake later testified positive for COVID-19.

{¶3} Blake informed Dudley of his test result. Dudley advised Blake to stay away from work for 10 days consistent with then-current guidance from the Centers for Disease Control ("CDC"). Mike Siler, the owner of Siler Excavation told Blake that he wanted him back to work the following Monday.[1] Blake informed Dudley of Siler's request. Dudley then told Siler personally that Blake's positive diagnosis meant that Blake needed to remain away from work for 10 days under the CDC's guidance.

{¶4} According to the amended complaint, when Dudley told Siler that Blake should not come to work, Siler became upset and told Dudley that "[i]t's my f---ing company and I'll do what I want." Siler then told Dudley that "he could not trust her to go to the CDC" and that she needed to pack her things and leave.

{¶5} Dudley filed a complaint for wrongful termination against Siler Excavation. After answering the complaint, Siler Excavation filed a Civ.R. 12(B)(6) motion to dismiss. Dudley could not dispute that she was an at-will employee of Siler Excavation. However, she claimed that her dismissal met the exception to the employment-at-will doctrine where an employer discharges an employee in contravention of a sufficiently clear public policy.

{¶6} Following briefing, the trial court granted the Civ.R.12(B)(6) motion to dismiss. In so doing, the trial court found that Dudley failed the first element of the public policy exception, the clarity element, which requires the employee demonstrate that a "clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law." Dudley now appeals, raising a single issue for determination:

---

1. There is no information stating what day of the week Blake became ill or tested positive for COVID-19.

**{¶7}** WHETHER THE TRIAL COURT ERRED IN RULING THAT PLAINTIFF FAILED TO SATISFY THE "CLARITY" ELEMENT OF A CLAIM FOR WRONGFUL TERMINATION IN VIOLATION OF OHIO PUBLIC POLICY, IN LIGHT OF OHIO'S CLEAR PUBLIC POLICIES ENCOURAGING SAFETY IN THE WORKPLACE AND FORBIDDING RETALIATION AGAINST THOSE WHO EXPRESS CONCERNS AIMED AT CORRECTING UNSAFE OR UNHEALTHY WORKING CONDITIONS.[2]

**{¶8}** In her sole assignment of error, Dudley argues the trial court erred by granting the motion to dismiss.

## Standard of Review

**{¶9}** Civ.R. 12(B)(6) authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted. *Marchetti v. Blankenburg*, 12th Dist. Butler No. CA2010-09-232, 2011-Ohio-2212, ¶ 9. "In order to prevail on a Civ.R. 12(B)(6) motion, 'it must appear beyond doubt from the complaint that the plaintiff can prove no set of facts entitling relief.'" *Id.*, quoting *DeMell v. Cleveland Clinic Found.*, 8th Dist. Cuyahoga No. 88505, 2007-Ohio-2924, ¶ 7. In ruling on a complaint under Civ.R. 12(B)(6), the trial court must presume that all factual allegations in the complaint are true and draw all reasonable inferences in favor of the nonmoving party. *Mitchell v. Lawson Milk Co.*, 40 Ohio St.3d 190, 192 (1988). However, unsupported legal conclusions are not accepted as true for purposes of a motion to dismiss. *Schulman v. Cleveland*, 30 Ohio St.2d 196, 198 (1972).

**{¶10}** "A trial court's order granting a motion to dismiss pursuant to Civ.R. 12(B)(6) is subject to de novo review on appeal." *BAC Home Loans Servicing, L.P. v. Kolenich*, 194 Ohio App.3d 777, 2011-Ohio-3345, ¶ 35 (12th Dist.). This court therefore must

---

2. While Dudley raises an "issue" in her appellate brief, she fails to identify it as an "assignment of error." Dudley's brief therefore does not conform to our local rules. Loc.R. 11. Nevertheless, we address the issue raised, which we consider her assignment of error.

independently review the complaint to determine the appropriateness of the trial court's dismissal. *Fontain v. H&R Cincy Properties, L.L.C.*, 12th Dist. Warren No. CA2021-02-015, 2022-Ohio-1000, ¶ 56.

### Wrongful Discharge

{¶11} There is no dispute that Dudley was an at-will employee. Under the common law doctrine of at-will employment, Dudley could be fired at the will of Siler Excavation. "However, if an employee is discharged in contravention of a clear public policy articulated in the Ohio or United States Constitution, federal or state statutes, administrative rules and regulations, or common law, a cause of action for wrongful discharge in violation of public policy may exist as an exception to the general rule." *McJennett v. Lake Waynoka Property Owners*, 12th Dist. Brown No. CA2013-05-006, 2013-Ohio-5767, ¶ 12, citing *Painter v. Graley*, 70 Ohio St.3d 377 (1994), paragraph three of the syllabus.

{¶12} To establish a prima facie claim of wrongful discharge in violation of public policy, the employee must demonstrate the following four elements:

> 1. That clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (known as the clarity element).
>
> 2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (known as the jeopardy element).
>
> 3. The plaintiff's dismissal was motivated by conduct related to the public policy (known as the causation element).
>
> 4. The employer lacked overriding legitimate business justification for the dismissal (known as the overriding justification element).

*Rose v. CTL Aerospace, Inc.*, 12th Dist. Butler No. CA2011-09-171, 2012-Ohio-1596, ¶ 22. The clarity and jeopardy elements involve questions of law, whereas the causation and overriding justification elements involve questions of fact. *Collins v. Rizkana*, 73 Ohio St.3d

65, 69-70 (1995).

**The Clarity Element**

{¶13} As referenced above, to satisfy "the clarity element," an employee must show that a clear public policy existed and was manifested in a state or federal constitution, statute, or administrative rules and regulations, or in the common law. *McJennett* at ¶ 12. The Ohio Supreme Court in *Dohme* recognized the possibility that a claim for wrongful discharge in violation of Ohio's public policy favoring workplace safety may exist. *Dohme v. Eurand Am., Inc.*, 130 Ohio St.3d 168, 2011-Ohio-4609, ¶ 24. However, the *Dohme* court held that the plaintiff in that case failed to satisfy the clarity element. *Id.*

{¶14} In *Dohme*, the employee claimed that he was terminated in violation of Ohio's public policy favoring workplace safety because he was discharged after expressing fire safety concerns to an insurance company representative who was inspecting the facility. *Id.* at ¶ 4. As the source of his public policy claim, he recited syllabus language from the Ohio Supreme Court's decision in *Pytlinski v. Brocar Prods., Inc.*, 94 Ohio St.3d 77 (2002), which stated: "Ohio public policy favoring workplace safety is an independent basis upon which a cause of action for wrongful discharge in violation of public policy may be prosecuted." *Dohme* at ¶ 20. The employee also cited generally to the plurality opinion of *Kulch v. Structural Fibers, Inc.*, 78 Ohio St.3d 134, 152 (1997). *Dohme* at ¶ 20.

{¶15} The Court in *Dohme* held that "the mere citation of the syllabus in *Pytlinski* is insufficient to meet the burden of articulating a clear public policy of workplace safety." *Id* at ¶ 21. The Court explained that "as the plaintiff, Dohme has the obligation to specify the sources of law that support the public policy he relies upon in his claim." *Id.* at ¶ 22. Referencing its prior decisions in *Pytlinski* and *Kulch*, the Court stated that both those plaintiffs alleged that their respective employers had violated federal OSHA regulations. *Id.* at ¶ 21. In *Pytlinski*, the terminated employee alleged that he provided his employer with a

memorandum detailing the violation of OSHA regulations occurring in the workplace. *Pytlinski* at 78. Similarly, in *Kulch* the terminated employee alleged that after his verbal complaints of the health violations were ignored by the employer, he filed a written report with OSHA, which resulted in an on-site inspection and OSHA finding several violations of its standards. *Kulch* at 135.

{¶16} Unlike those cases, the Court in *Dohme* found that the plaintiff failed to cite any specific, applicable source of law and therefore could not satisfy the clarity element. *Dohme*, 2011-Ohio-4609 at ¶ 28. In so doing, the supreme court stated that "[a] general reference to workplace safety is insufficient to meet the clarity requirement." *Id.* at ¶ 24. Accordingly, *Dohme* holds that an employee cannot simply allege that clear public policy exists because of a "general societal interest," but rather must set forth a specific law evincing public policy. *Creveling v. Lakepark Industries, Inc.*, 6th Dist. Huron No. H-20-013, 2021-Ohio-764, ¶ 52.

**Dudley's Claimed Public Policy Exception**

{¶17} Dudley maintains that she cited "numerous specific statutes and regulations that supported the clear existence of the public policy at issue." In her complaint, Dudley states that "[a] clear public policy in support of a safe workplace exists in the State of Ohio, manifested in the federal Occupational Safety and Health Act, Ohio statutory law, and elsewhere." She further alleges that the clear public policy "encourages safety in the workplace and forbids retaliation against those who express safety concerns aimed at correcting unsafe or unhealthy working conditions." Dudley maintains that she was terminated because she expressed a concern about a workplace condition affecting health and safety when "she told her boss that an employee infected with a potentially fatal virus should be quarantined for the recommended period." In her amended complaint, Dudley stated:

A clear public policy in support of a safe workplace exists in the State of Ohio, manifested in the federal Occupational Safety and Health Act, Ohio statutory law, and elsewhere. This public policy is demonstrated through any one or all of the following: 28 U.S.C. § 651, et seq., 28 U.S.C. § 654, 28 U.S.C. § 660(c), 29 CFR 1903.35(b)(1), 29 CFR 1904.36, Ohio Rev. Code 4101.11 and 4101.12, and the Ohio Supreme Court's decisions in Kulch v. Structural Fibers, 78 Ohio St.3d 134, 152 (1997) and Ptylinski v. Brocar Prods., 94 Ohio St.3d 77, 79 (2002).

**{¶18}** On appeal, Dudley asserts "it is clear that Ohio intended for Covid-positive employees to isolate for a period of time, in the interests of protecting the health and safety of the broader workforce." Dudley points to then-current guidance from the Ohio Department of Health as part of Ohio's "Responsible Restart," which "*recommended* 10 days of isolation for employees with Covid-19." (Emphasis added.) She maintains that she was "acting in furtherance of that clearly articulated Ohio public policy when she opposed an infected and contagious employee returning to the workplace prematurely" and that her termination violated that clear public policy.

**Federal Provisions (OSHA)**

**{¶19}** Following review, we find none of the various provisions or cases cited by Dudley express a clear public policy applicable to her in this case. Dudley's references to "workplace safety" are the same general arguments made by the plaintiff in *Dohme* and were found to be insufficient to meet the clarity element of a wrongful discharge claim.

**{¶20}** Dudley argues that 29 U.S.C. 651, 654, and 660(c) demonstrate a clear public policy for purposes of establishing the clarity element.[3] It is true that the "OSH Act" was enacted for workplace safety. The statute reveals that its declared purpose is "to assure so far as possible every working man and woman in the Nation safe and healthful working

---

3. We agree with the trial court that citations to Chapter 28 of the U.S. Code have no application to this case. However, the parties below agreed that Dudley meant to cite to the provision contained in Chapter 29, the OSH Act. Therefore, we will consider those provisions which were argued below.

conditions." 29 U.S.C. 651(b). To that end, 29 U.S.C. 651 sets forth 13 broad policy provisions designed for general health and safety of workers in the United States, including "encouraging employers and employees * * * to reduce the number of occupational safety and health hazards at their places of employment." *Id.* at (b)(1). Similarly, 29 U.S.C. 654 provides:

> (a) Each employer—
>
>> (1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;
>>
>> (2) shall comply with occupational safety and health standards promulgated under this Act.
>
> (b) Each employee shall comply with occupational safety and health standards and all rules, regulations, and orders issued pursuant to this Act which are applicable to his own actions and conduct.

29 U.S.C. 660(c)(1) makes it illegal to terminate an employee in retaliation for filing a complaint or instituting a proceeding with OSHA.

{¶21} The United States Supreme Court has recently provided guidance distinguishing between the spheres of workplace safety and public health in light of COVID-19. *See Nat'l Fed'n of Indep. Bus. v. DOL, OSHA*, __U.S.__, 142 S. Ct. 661 (2021). In *NFIB*, the Supreme Court stayed enforcement of a rule issued by OSHA requiring employers to enforce a mandatory COVID-19 vaccination policy. *Id.* at 663. In so doing, the Court emphasized the "crucial distinction" "between occupational risk and risk more generally." *Id.* at 666. To be enforceable, workplace safety standards must address occupation-specific risks that employees face at work. The risks must be related in a "causal sense" to the workplace and these risks differ from everyday risks that all people face. *Id.* Thus, a rule addressing the risks posed by COVID-19 is a permissible workplace

safety standard under the OSH Act only "[w]here the virus poses a special danger because of the particular features of an employee's job or workplace," such as where the employee is a researcher working with the COVID-19 virus. *Id.* at 665-66.

{¶22} In contrast, public health measures addressing universal risks, like "crime, air pollution, or any number of communicable diseases" are not *occupational* hazards. *Id.* at 665. Such threats do not have a causal relationship to the workplace but, instead, are "hazards of daily life." *Id.* They do not become workplace hazards "simply because most Americans have jobs and face those same risks while on the clock." *Id.* Because "permitting OSHA to regulate the hazards of daily life" would "significantly expand OSHA's regulatory authority without clear congressional authorization," the U.S. Supreme Court concluded that the vaccine mandate "extend[ed] beyond the agency's legitimate reach." *Id.* at 666.

{¶23} In light of *NFIB*, we reject Dudley's broad interpretation of state and federal law as applying generally to COVID-19 hazards in the workplace. Notably, Dudley does not claim that her employment involved an occupational risk more than can be characterized as a hazard of daily life. "COVID-19 can and does spread at home, in schools, during sporting events, and everywhere else that people gather." *Id.* at 665. There is nothing to suggest COVID-19, or any other communicable disease or virus, poses a special danger because of her job or workplace. COVID-19 is simply a hazard of daily life. The mere citation to *Pytlinski* and *Kulch*, along with other OSHA provisions and regulations are insufficient to meet the burden of articulating a clear public policy specific to workplace safety in context of COVID-19. As the plaintiff, Dudley has the obligation to identify the specific source of law that supports the public policy she relies upon in his claim. *Dohme*, 2011-Ohio-4609 at ¶ 22.

{¶24} In so holding, we find Dudley's reliance on recommendations published as

"guidance" from the Ohio Department of Health's "Responsible Restart" is an insufficient basis to support a clear public policy for purposes of meeting the clarity requirement. Rather, her general suggestions of public policy effecting workplace safety are more similar to the claims made by the plaintiff in *Dohme. Id.* (plaintiff claimed there was a public policy favoring workplace fire safety, which was supported by citation to various state and federal statutes and regulations).

{¶25} While the guidance provided by the Ohio Department of Health and the CDC may have called for 10 days of isolation from employees with COVID-19, nothing in the guidance cited by Dudley required businesses to adopt any particular protocol. Rather, the guidance is comprised of "Universal Recommended Best Practices." In efforts to slow the spread of COVID-19, the Ohio Department of Health also stated that employers could choose to require masking, social distancing, and other COVID-19 mitigation measures, such as testing. *See also Arterbridge v. Wayfair, L.L.C.*, D.N.J. No. 1:21-cv-13306, 2022 U.S. Dist. LEXIS 33338, at *9-10 (Feb. 24, 2022). In other words, "businesses were and are empowered to make their own choices" with respect to COVID-19 mitigation measures. *Id.* Nothing that Dudley cites mandates any COVID-19 response—each workplace is unique and free to respond as deemed appropriate.

{¶26} We likewise find that Dudley's reliance on OSHA egulations found in two sections of the Code of Federal Regulations to be misplaced. 29 C.F.R. 1904.35 requires employers to maintain records of work-related injuries and requires employees to participate in the recordkeeping system by reporting work-related injuries and illnesses. 29 C.F.R. 1904.36 prohibits discrimination against an employee who reports a work-related fatality, injury, or illness.

{¶27} In this case, Blake reported his illness to Dudley who told him to quarantine for 10 days. When Blake later told Dudley that Siler wanted him back to work after the

weekend, Dudley told Siler that Blake "should remain away from work for 10 days per the CDC's guidance." For the reasons listed above, Dudley has not established that the guidance provided by the CDC or the Ohio Department of Health amounted to a sufficient articulation of public policy. Dudley was not terminated for reporting Blake's illness, but upon her disagreement with her employer's COVID-19 response. As a result, we find the federal authorities cited by Dudley, namely 29 U.S.C. § 651, 29 U.S.C. § 654, 29 U.S.C. § 660(c), 29 C.F.R. 1904.35, and 29 C.F.R. 1904.36 do not support her claim for meeting the public policy exception to the employment at-will doctrine.

**R.C. 4101.11 and R.C. 4101.12**

**{¶28}** Dudley also cites two Ohio Revised Code sections to support her argument. Similar to the federal authorities listed above, Ohio also has statutes involving the duty of an employer to protect employees and frequenters and to furnish a safe place of employment. The first, R.C. 4101.11, is titled "Duty of employer to protect employees and frequenters" and states:

> Every employer shall furnish employment which is safe for the employees engaged therein, shall furnish a place of employment which shall be safe for the employees therein and for frequenters thereof, shall furnish and use safety devices and safeguards, shall adopt and use methods and processes, follow and obey orders, and prescribe hours of labor reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters.

The other provision, R.C. 4101.12 is titled "Duty of employer to furnish safe place of employment" and states:

> No employer shall require, permit, or suffer any employee to go or be in any employment or place of employment which is not safe, and no such employer shall fail to furnish, provide, and use safety devices and safeguards, or fail to obey and follow orders or to adopt and use methods and processes reasonably adequate to render such employment and place of employment

- 11 -

safe. No employer shall fail to do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees or frequenters. No such employer or other person shall construct, occupy, or maintain any place of employment that is not safe.

{¶29} There is a split of authority as to whether R.C. 4101.11 and 4101.12 satisfy the clarity element of a public policy claim based upon workplace safety. The Sixth District Court of Appeals stated that R.C. 4101.11 and 4101.12 were too "general and broad" to support a claim for wrongful termination in violation of public policy. *Whitaker v. FirstEnergy Nuclear Operating Co.*, 6th Dist. Ottawa No. OT-12-021, 2013-Ohio-3856, ¶ 25. The Tenth District Court of Appeals disagreed with *Whitaker*'s conclusion that R.C. 4101.11 and 4101.12 are "too 'general and broad' to support" a claim for wrongful termination in violation of public policy. *Blackburn v. Am. Dental Ctrs.*, 10th Dist. Franklin No. 13AP-619, 2014-Ohio-5329, ¶ 29.

{¶30} Several courts have recognized this split of authority. *Rowe v. Hoist & Crane Serv. Group, Inc.*, 8th Dist. Cuyahoga No. 110921, 2022-Ohio-3130, ¶ 30; C*oldly v. Fuyao Glass America, Inc.*, 2d Dist. Montgomery No. 29309, 2022-Ohio-1960, ¶ 40; *Jones v. Natural Essentials*, 11th Dist. Portage No. 2021-P-0066, 2022-Ohio-1010, ¶ 67. However, the issue of whether R.C. 4101.11 and 4101.12 satisfy the clarity element of an Ohio public policy claim based upon workplace safety is not one we must decide in the instant action.

{¶31} This is because the facts in this case do not involve even a questionable occupational safety hazard or workplace safety issue. As discussed, the supreme court in *Dohme* stated that "[a] general reference to workplace safety is insufficient to meet the clarity requirement." *Dohme*, 2011-Ohio-4609 at ¶ 24. As we have already determined, Dudley's references to workplace safety relate to the general risk of COVID-19. Dudley's suggestions of public policy involving COVID-19 fail for the same reasons plaintiff's claims in *Dohme* failed.

**{¶32}** Furthermore, although *Whitaker* and *Blackburn* may be in conflict, neither case involved a communicable disease which is more accurately characterized as a general health risk, not a specific workplace risk. For reasons stated above, providing a safe workplace does not mean the elimination of every outside illness that could potentially enter the workplace. *See NFIB*, 142 S.Ct. at 666. Creation of such a broad public policy exception would be unworkable and significantly undercut the doctrine of at-will employment. *Jacobs v. Highland Cty. Bd. Of Commrs.*, 4th Dist. Highland No. 13CA20, 2014-Ohio-4194, ¶ 21-22. As such, any claimed public policy exception must be sufficiently clear and narrowly applied. *Petras v. 3G Operating Co.*, 11th Dist. Lake No. 2020-L-084, 2021-Ohio-473, ¶ 27. Dudley has failed to identify specific, clear, and applicable statutes, rules or constitutional provisions to support her public policy claim and has, therefore, failed to establish the clarity element.

**{¶33}** Since Dudley failed to meet the clarity element, the trial court did not err in dismissing her claim for wrongful termination. The failure to meet any element of the public policy exception is fatal to her claim for wrongful termination. No further consideration of the remaining elements is required. *Guardo v. Univ. Hosp. Geauga Med. Ctr.*, 11th Dist. Geauga No. 2014-G-3178, 2015-Ohio-1492, ¶ 48 (no further analysis necessary where appellant fails to satisfy the first element of her wrongful discharge claim). Accordingly, we find Dudley's sole assignment of error is without merit.

**{¶34}** Judgment affirmed.

HENDRICKSON, J., concurs.

BYRNE, J., concurs separately.

**BYRNE, J., concurring separately.**

{¶35} I concur with and fully join the court's opinion. I write separately, however, to emphasize a simple point: mere guidance issued by the Ohio Department of Health, even when related to a virus like COVID-19, is not law.

{¶36} As explained in the court's opinion, claims of wrongful discharge in violation of public policy must be based on a "clear public policy [that] existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law." *McJennett*, 2013-Ohio-5767, at ¶ 12. Dudley argues, in part, that the alleged public policy supporting her wrongful termination claim is found in the Ohio Department of Health's "Responsible Restart" guidance.

{¶37} Article II, Section 1 of the Ohio Constitution vests state legislative power in the General Assembly, and in "the people," who can adopt legislation or a state constitutional amendment by initiative, or repeal an existing statute by referendum. But the "Responsible Restart" guidance is not found in the Ohio Constitution, was not part of a bill passed by the General Assembly and signed by the Governor, and was not found in any ballot initiative or referendum approved by the state's voters.

{¶38} An Ohio executive branch agency has the authority to issue regulations when the General Assembly, by statute, delegates to the agency the authority to do so. *See TWISM Enters., L.L.C. v. State Bd. of Registration for Professional Engineers & Surveyors*, Slip Opinion No. 2022-Ohio-4677, ¶ 30-32. Even when delegated such authority, the agency must comply with certain administrative rulemaking requirements, including the requirements of the Ohio Administrative Procedures Act, R.C. 119.01 through 119.14. Critically, the "Responsible Restart" guidance on which Dudley relies, while issued by a state executive branch agency, was not part of any regulation adopted pursuant to administrative rulemaking requirements. The guidance is simply that: guidance, a

suggestion. Mere guidance does not give rise to a public policy forming the basis for a wrongful termination claim.

**{¶39}** Were we to find, as Dudley urges, that the "Responsible Restart" guidance at issue here could serve as the public policy basis for a wrongful termination claim, we would essentially be throwing aside the system of separation of powers created by the Ohio Constitution. We would also create a means for the executive branch to create law by a "backdoor" approach—that is, the executive branch could avoid the difficult work of passing legislation in the General Assembly or completing the administrative rulemaking process, and instead create law enforceable by the courts by simply issuing "guidance." This we cannot do.

**{¶40}** Citizens may disagree about the advisability and efficacy of the executive branch's "Responsible Restart" guidance. It is the job of the courts not to take a side in such debates, but to apply the law as written. Here, no "state or federal constitution, statute or administrative regulation, or [the] common law" serves as the basis for the public policy on which Dudley purports to rely, and so we must affirm the trial court's decision. *McJennett*, 2013-Ohio-5767, at ¶ 12.